JOHN GANN v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY and GEORGE N. LISTON, Appellants.—6 S. W. (2d) 39.

Division One, March 3, 1928.

216

*Luther Burns, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellants.

*Davis & Ashby, L. B. Gillihan, M. P. Murphy* and *Pross T. Cross* for respondent.

ELLISON, C.—The plaintiff had a verdict and judgment below for $10,000 for damages for personal injuries against the defendants, Chicago, Rock Island & Pacific Railway Company, and George U. Liston, its locomotive engineer. Both defendants appeal. The case grows out of a grade crossing collision at Jamesport, Missouri, on the afternoon of June 17, 1922. The respondent was riding in the back seat of a Ford touring car driven by one Tobe Gillilan and owned by Frank Gay, who was the third member of the party. As the automobile was passing along a public road across the railroad station grounds it was struck by a passenger train. The evidence for respondent was that the planking of the railroad crossing was broken, rough and uneven. After the front wheels of the automobile had crossed the first rail of the track they struck the rough planking, the car bounced and the motor stopped. The driver started the engine again and got nearly over, but the locomotive struck the back wheel and fender.

The respondent's petition made several assignments of negligence which were not submitted to the jury. Those on which he stood were: (1) negligent construction and maintenance of the crossing; (2) failure to give statutory warning signals by bell or whistle; (3) humanitarian doctrine, in that the appellant engineer and other operatives of the passenger train saw, or should have seen, plaintiff

in a position of imminent peril on or approaching the track, in time to have averted his injuries by stopping or slowing the train or by warning the occupants of the automobile. The separate answers of the two defendants both contained a general denial and a plea of contributory negligence.

The respondent's instruction submitting the issue as to the defective crossing authorized a verdict against the defendant railway company only; the instruction covering the alleged failure to sound the statutory warning signals and the one on the humanitarian doctrine authorized a verdict against both defendants. As already stated, the verdict returned by the jury was against both defendants.

The assignments of error made by appellants are as follows:

(1) Under all the evidence the sole proximate cause of the accident was the defective crossing, in consequence of which the trial court erred in refusing to direct a verdict for the defendant engineer, Liston, and in instructing on the two other theories.

(2) Since the jury found against both defendants the verdict must have been on one of the two submitted issues whereon a joint verdict was authorized, and as there was no evidence to support a verdict on either of these grounds, the judgment should be reversed as to both defendants.

(3) Respondent's Instruction 4 erroneously commented on the parties and appealed to the prejudice of the jury. We shall set out this instruction later.

(4) The argument and conduct of plaintiff's counsel was improper.

A discussion of the foregoing assignments necessitates a fuller review of the evidence, particularly that favorable to respondent, since appellants challenge the sufficiency thereof; but the facts gleaned from the record of nearly 700 pages may be summarized within a fairly narrow compass. The general circumstances have already been stated. In connection with the further detailing of facts, the plat below should be consulted.

The public highway which figures in the case was a street of Jamesport called East Street. As it entered the station grounds from the north it described a curve, first easterly and then southerly, and thence ran in a straight line substantially south, crossing the railroad tracks at right angles. There were four tracks. The first track—the one farthest north—was a house track for the storage, loading and unloading of cars. Thirty-six feet south of this was the main or through track at which the accident occurred. The train involved was a local passenger train approaching the station from the east.

To one traveling south on the highway the view to the east of trains on the main track was obstructed until the house track had been passed, as will be explained. On the day of the collision strings of box cars were standing on the house track on both sides of the highway crossing. The end of the west car on the east side of the highway was close to the crossing. The overhang of these cars was two feet and six inches—that is, the sides projected that far over the rails. About ten feet north of these cars, and something near forty feet east of the highway, was a cement building. It was possible, in going along East Street at this point, to obtain a view of the railroad tracks to the east by looking between the cement building and the box cars, but the view was necessarily brief, and restricted. A civil engineer who appeared as a witness for appellants testified that the field of vision ranged from a maximum distance of 4000 feet to a minimum distance of 312 feet east of the grade crossing, along the main track.

Continuing south on the highway, as one first came from behind the box cars and looked eastwardly along the south side thereof, the distance within view along the main track was 225 feet, according to respondent, and about 265 feet, according to appellants. This was from a point about thirty-three feet north of the main track. From there on south the range of view progressively increased until finally at a point about ten or twelve feet north of the main track the traveller's line of vision cleared the box cars altogether and he could see east along the main track for more than half a mile. Figures given in the testimony for appellants on this point were as follows:

| View from position north of main track | Distance to be seen down main track |
|---|---|
| 30 feet | 285 feet |
| 25 feet | 355 feet |
| 20 feet | 445 feet |
| 15 feet | 515 feet |
| 12 feet | 2875 feet |

The respondent's testimony was that as the automobile approached the railroad crossing he looked both ways and listened for trains,

both for his own protection and that of the other occupants of the car. About six or eight feet north of the house track the car stopped and he (respondent) looked and listened, but from his position in the back seat he could not see to the east on account of the concrete building. The automobile started forward, moving across the house track at two or three miles per hour and from then on at six or eight miles per hour. His attention was drawn to a noise coming from the west, which he feared might be from switching cars. He continued looking westward until the automobile passed beyond the box cars. Then he looked east, but saw and heard no train. He turned again to the west looking toward the station, where a truck piled high with baggage obstructed his view. Then he swung his head back to the east, noting the rough crossing as he turned, and there he saw the train 250 to 350 feet away. He called out to the others, and became excited and tried to get out. At that time the front of the automobile was within two to six feet of the track, which put the respondent, in the rear seat, ten feet further back or twelve to eighteen feet therefrom. The driver continued forward, but when the front wheels hit the rough crossing the car bounced, the occupants flew in the air and the engine went dead. The driver started up again and had got partly over when the train struck them. When the motor stalled the locomotive was probably 100 to 150 feet away. This was all the respondent remembered of the accident. He said, however, that at no time did he hear the bell or whistle of the train.

As to the sounding of the statutory alarm signals. Five witnesses were produced by respondent who testified the train whistled at a point some of them called the "gate crossing," the distance of which was variously given as a half mile to a mile east of Jamesport, and not after that until the alarm whistles were sounded just before the locomotive hit the automobile. Three of these witnesses said they did not hear the alarm whistles. There was some evidence—not so positive, but still, we think, substantial, in the sense of making the issue a question for the jury,—that the bell was not ringing. Ten witnesses testified for appellants that they heard the locomotive whistle, but not all of them were definite as to whether it was for the crossing where the accident occurred, and some of these were unable to say the bell was ringing, though they were where they could have heard it. The engineer and most of the train crew, however, were positive and definite that the bell was ringing and that the whistle was sounded on four separate occasions before the accident: (a) the station whistle, (b) for the "Mill Pond" crossing (next east of the one in question), (c) for the East Street crossing where the collision occurred, (d) and the alarm whistles just before the automobile was struck.

Getting back to the story of the collision, as told by the defendant locomotive engineer. In his train there were five steel cars sixty-five

to seventy feet long. The locomotive and tender were probably of about the same length. It was forty to forty-five feet from the front of the engine back to the cab window. Going west, the engineer riding on the right side, could see the north side of the right of way. He it was who observed the movements of the automobile just preceding the collision.

The engineer testified his train was running perhaps forty miles per hour until he got within about 2000 feet of the station, when he made a service application of the air brakes preparatory to the station stop. Its speed was thereby reduced to twenty or twenty-five miles per hour by the time it reached a point about 150 to 175 feet east of the grade crossing. There, looking to the northwest through the narrow open space between the cement building and the box cars on the house track, he saw the automobile pass south along the highway and disappear behind the box cars. He continued to watch and presently it reappeared on the south side of the box cars, thirty or thirty-five feet north of the main track (according to admitted figures the exact distance from the south side of the box cars to the north rail of the main track was thirty-three feet and three inches.)

The automobile then, as before—and as it continued to do until struck—was moving at a uniform speed of twelve or fifteen miles per hour. At first the engineer thought the car either would stop or turn into the station grounds, but after it ran along the road without slowing up until within something like twenty feet of the main track, he concluded it might not stop and at once sounded the alarm whistle, three short blasts, and made a service (not an emergency) application of the air brakes. The locomotive was perhaps fifty feet east of the crossing when it first occurred to him the automobile might not stop, and was drifting into the station at twenty miles per hour, as it had been since he first saw the car. The blowing of the whistle three times, first, and the application of the air brakes, second, were all done after the train was that close to the crossing. The automobile went on, unchecked, and disappeared from his view, in front of the locomotive, when the latter was yet ten or twelve feet from the crossing. The train came to a stop with the fourth car right over the crossing. (This means the train ran between 300 and 350 feet before stopping.)

By way of explaining why he used a service application of the air brakes instead of an emergency application, the engineer said an emergency application involves the operation of a different valve—a triple valve—which will not respond unless the train-line air-pressure is as high as seventy pounds. The standard train-line pressure on the Rock Island railway is seventy pounds, which he carried that day. When he made the service application of the air brakes two thousand feet back for the station stop, it reduced the train-line pres-

sure ten pounds, to sixty pounds, which was too low to trip the emergency valve.

Four locomotive engineers testified for appellants as expert witnesses. They said a stop within three hundred to four hundred feet on a service application of the air brakes, at twenty miles per hour, was a good stop. The respondent produced two former engineers as experts, one of whom testified that at twenty miles per hour the train could have made an emergency stop in twenty-five or thirty feet, or one second; the other said forty feet or two seconds. One of these witnesses stated if there had been a previous service application so that the brake shoes were set and all slack taken out of the train and the braking equipment, the emergency stop could be made even more quickly. The other said standard train-line pressure on passenger trains was one hundred and ten pounds, on freight trains ninety pounds.

On cross-examination the engineer admitted several times he did not sound the alarm whistle until the locomotive was within fifty feet of the crossing, because he thought the automobile would stop. He admitted, also, that the automobile was then within three to twelve feet of the crossing. He said the marks on the automobile and locomotive after the collision indicated if the car had run a foot or so farther it would not have been hit. He denied the automobile stopped on the crossing, and further denied that, even if it did, he could have stopped the train by applying the air brakes two hundred feet back (where respondent said the locomotive was when the automobile stopped). He admitted, however, he could have slowed up the train in forty feet. It appears he was not directly asked at the trial whether he saw the occupants of the automobile looking at or in the direction of the train; but in a previous deposition he testified: "Just before they went out my sight (in front of the locomotive) they kinda looked up toward the engine and I seen the most astonishing expression on their face as I ever saw." This, he added, was the first indication he saw on their part that they knew the train was coming. The deposition was introduced at the trial as an admission, against the appellant engineer only.

There were two other men on the locomotive at the time. One was another engineer who was learning the road, and the other was the fireman. Contrary to what the appellant engineer said, the fireman testified the automobile was *standing* on the track when he first saw it a very few seconds before the accident; but he put it further south than the respondent had said it was. The fireman said it appeared the *rear* end of the vehicle was about midway between the two rails of the track. Further, in direct contradiction of the testimony repeatedly given by the engineer, with his reasons therefor—that he did not sound the alarm whistle until the locomotive was within fifty

feet of the crossing—the fireman said the engineer sounded the *alarm* whistle on two occasions. The first time was when the locomotive was just past the Mill Pond crossing, next east of the East Street crossing. He estimated the distance between the two crossings at one hundred feet, but the scale map introduced in evidence by appellants shows it was four hundred and twenty feet. The fireman testified he looked out the window that time and could see nothing. The locomotive was close to the East Street crossing when the engineer sounded the alarm whistle the second time. He (the fireman) looked out once more within a second or less and saw the automobile only thirty-five feet away. After giving this testimony the fireman took the stand again the following day and said the first time he heard the whistle (when he looked out and saw nothing) the engine was ninety feet from the crossing. Also contradicting the detailed and positive testimony of the appellant engineer, the observer engineer who was riding on the locomotive said the alarm whistle was sounded the first time between the house track switch stand and switch frog, about one hundred and sixty or two hundred feet east of the crossing. The appellant's scale map shows the frog of this switch is about two hundred and eighty-five feet east of the crossing, and the switch stand three hundred and sixty-five feet.

There were other matters in which the respondent was corroborated and the engine crew contradicted by other testimony in the case. It will be remembered the respondent testified the locomotive was still one hundred feet to one hundred and fifty feet east of the crossing when the automobile stalled thereon, whereas the engineer insisted the car did not stop on the crossing at all. Not only was this statement of the engineer's contradicted by the fireman (as has been noted), but by the respondent's witness Rader, and the appellant's witness Irvin, as well. Both of these were eye-witnesses and they said the automobile did stop on the crossing—and they put the train even further back east at that time than did respondent; they said it was two hundred feet to three hundred feet away.

The physical facts also tend to bear out the respondent's theory on this important issue of fact. The scale map introduced by the appellants and the testimony of their surveyor show the locomotive must have been at least two hundred and eighty-three feet to three hundred and fifty feet east of the crossing for the engineer to see the automobile fifty feet north thereof (looking along the north side of the box cars on the house track). This being so, the automobile was bound to reach the crossing well before the locomotive got to that same point. This is true whether the automobile moved across the house track at three miles per hour, as respondent said, and from there on to the main track at eight miles per hour as respondent and several other witnesses testified, or whether it travelled at a

uniform speed of twelve to fifteen miles per hour, as the engineer said—obviously true under the latter hypothesis, since the locomotive was going twenty miles per hour under all the evidence. The inference to be drawn from the physical facts corroborates the engineer's testimony that he did not apply the air brakes until within fifty feet of the crossing. The testimony of appellants' experts was that a service stop within three or four hundred feet at twenty miles per hour was all that could be expected. The five-car train with engine and tender was about four hundred feet long. Two witnesses said the train stopped with the rear car west of the crossing, two that the fourth car was on the crossing, one that the engine stopped alongside the depot and one that it did not reach the depot. The east end of the depot was two hundred and sixty-five feet west of the crossing. All this indicates the locomotive stopped three hundred feet to four hundred and fifty feet west of a point fifty feet east of the crossing.

So the respondent had a case for the jury in which it was shown by substantial evidence that (1) the train was one hundred to two hundred feet east of the crossing when the automobile stopped there; (2) that the engineer was looking and saw the automobile approaching over a distance of about fifty feet for an appreciable period of time before that; (3) that the occupants of the automobile did not see or appear to see the train until it was almost on them; (4) that the engineer, nevertheless, did not sound the alarm whistle or put on the air brakes until within about fifty feet of the crossing; (5) that he could have slowed the train some in forty feet; (6) that if he had given the automobile time to run one more foot, or thereabouts, it would not have been struck.

I. Looking to appellants' assignments that the sole proximate cause of the accident was the defective crossing, and that there was no evidence to warrant the giving of instructions on the humanitarian doctrine and the failure to sound the statutory warning signals by bell or whistle. The appellants' reasoning is that since the automobile would have got across the track without injury had it not stalled on the defective crossing, therefore the crossing was the sole cause of the accident. We cannot agree to this summary conclusion.

We have already said there was sufficient evidence to take the case to the jury on the theory that the statutory signals were not given. Granting they were not, we must presume the automobile would not have gone upon the track had they been sounded. [McGee v. Wabash Railroad Co., 214 Mo. 544, 114 S. W. 33; Monroe v. C. & A. Railroad Co., 280 Mo. 488, 219 S. W. 68; Pierson v. Mo. Pac. Ry. Co., 275 S. W. 564.]

It is our view, furthermore, that there was ample evidence warranting the submission of the case on the humanitarian doctrine (Banks v. Morris & Co., 302 Mo. 256, 257 S. W. 484) ; and·on this theory also the defective crossing was not the sole cause of the accident. If the engineer had made only a service application of the air brakes one hundred feet or more east of the track, after the automobile stopped, it could have gotten on across even though it did stall—at least we certainly cannot say as a matter of law such is not the fact.··

It possibly may be true, or more nearly true, as appellants insist, if the case be taken on respondent's theory of the facts, that the automobile moved along the road at eight miles per hour and looked as if it would cross the track safely; that the locomotive was then one hundred to two hundred feet away,. going twenty miles: per hour; that the automobile suddenly stopped on the track—it may be true, we say, under these facts, that the failure to sound the *alarm whistle* was not a proximate cause of. the collision;·for there was no need to sound it before the automobile stopped and no use in sounding·it afterward; but even that conclusion is to be doubted when it is remembered the occupants of the automobile did not appear·to be looking at the train, or to see it. In any event, it was inexcusable to omit all effort to slow up or stop after the predicament of the travellers became apparent, until the locomotive was within fifty feet of the crossing. Taking the case on the engineer's testimony that the automobile did not stop—that is to say, that the locomotive and automobile reached the crossing at the same time—the failure sooner to sound the alarm whistle plainly made a last-chance case. [Zumwalt v. C. & A. Railroad Co., 266 S. W. 725.] .

The case of George v. K. C. So. Ry. Co. (Mo. App.), 286 S. W. 130, is cited by appellants as bearing out their theory that the defective crossing was the sole cause of the accident. We think the case is clearly distinguishable·from the case at bar. The facts there were that G. in driving a·motor truck accidentally "killed" the engine while crossing a railroad track. About that time during switching operations a box car standing on the track some one hundred feet or more away was bumped into and rolled along loose until it struck the truck. The Springfield Court of Appeals held the sole proximate cause of the accident was the stalling of the automobile motor on the crossing. But no one was on the box car to stop it; the stopping of the truck on the track was not due to any negligence of the defendant; and G. did not drive on the track because of any negligent failure of the defendant to sound statutory warning signals.

Appellants next argue that the· respondent's showing under the humanitarian doctrine is made only by drawing upon and adopting the admissions of the appellant engineer;·and that respondent can-

not base his case on the engineer's testimony, first, because it is destructive of his own, and, second, because if he would appropriate and take over a part of the engineer's testimony he must accept all of it. Indeed, appellants go further and assert he must also adopt the corroborating testimony of all of appellants' other witnesses as well. The cases cited are Behen v. St. L. Transit Co., 186 Mo. 441, 85 S. W. 346, and Graefe v. St. L. Transit Co., 224 Mo. 264, 123 S. W. 835, which follows and quotes from the Behen case.

In the Behen case the plaintiff's petition set up two inconsistent grounds of negligence (without pleading them in the alternative, as the statute sometimes permits). If one was true the other was false. The plaintiff's evidence conformed to one theory. The testimony for the defendant was directly opposed to plaintiff's first theory, and evidence, but tended to prove his second and inconsistent theory. He was permitted to go to the jury on both theories. After holding the trial court should have sustained a motion to require plaintiff to elect on which alleged act of negligence he would rely, the court said (186 Mo. l. c. 441):

"Whilst it is true that a plaintiff's case is sometimes made out, or aided, by defendant's evidence and also that a jury may believe part of a witness's testimony and disbelieve another part, yet before the plaintiff in this case can avail himself of the defendant's testimony to the effect that the deceased was attempting to leave the car while it was moving, he will have to confess that *all* of the evidence adduced in his behalf was untrue and that the *statement in his petition* that the car had stopped and was standing still, when the attempt to alight was made, *was also untrue,* and that only that part of defendant's testimony that suited the plaintiff's case was worthy of belief. A party will not be allowed to take such a position." (Italics ours.)

The cause was reversed and remanded (l. c. 445) because by the submission of the case under instructions embodying the two conflicting theories "the jury was authorized to render a verdict for the plaintiff even if they discredited *all* the evidence offered by him and in spite of the allegations in his petition." (Italics ours.)

In the instant case the admissions of the engineer are not at variance with all of respondent's testimony. On many very important matters they corroborate him, without involving any change in respondent's theory, pleaded and proven. And that a party may, in such circumstances, take advantage of the admissions of his adversary, the jury being at liberty to believe the admissions and reject the other testimony of the latter, is too well settled to admit of doubt. [Gould v. C. B. & Q. Railroad Co., 315 Mo. 722, 290 S. W. 138; Anderson v. Davis, 314 Mo. 550, 284 S. W. 449.]

II. Appellants complain of that part of respondent's Instruction P-3 which reads as follows:

"To have, by the exercise of ordinary care, stopped said train, or slackened the speed thereof (having due regard to the reasonable safety of the persons on and the equipment of said train) or to have given a warning," etc.

The criticism is that because of the presence of the comma after the word train in the second line, and the absence of a comma after the word thereof, the qualifying phrase in parenthesis is made to refer solely to the slackening of the speed of the train, and not to the stopping of the train as well, thereby imposing the duty on the train operatives of stopping the train regardless of the safety of persons thereon, etc. This criticism is too fine spun to merit discussion. We think the meaning of the instruction is obvious. Indeed it seems the punctuation conforms to good usage, the parenthesis marks being used where commas otherwise would be inserted, and performing the same office.

III. Respondent's Instruction P-4 was as follows:

"The jury are instructed that if the jury should find a verdict for plaintiff and against both defendants, then under the law plaintiff would be entitled to only one satisfaction of said judgment; that is to say, if you should find for plaintiff and against both defendants, and plaintiff should collect the amount of the judgment from one defendant, then plaintiff could not collect anything from the other defendant."

Appellants say this instruction went outside the issues, improperly commented on the parties and in effect told the jury if they should return a verdict against both the engineer and the railway company the latter could be made to foot the bill—ignoring the fact that the railway company would have a right of action for indemnity or contribution against the engineer on account of his misfeasance. [Sec. 4223, R. S. 1919; McGinnis v. C. R. I. & P. Ry. Co., 200 Mo. 359, 98 S W. 590.] It is further asserted that in cases of this kind the individual defendant is frequently joined to prevent a removal to the Federal courts, but that after that purpose has been served he is an encumbrance, because juries are disposed to deal gently with individual defendants and harshly with corporate defendants; and by such an instruction the individual defendant is cast aside so far as may be. The respondent defends by saying the jury might have thought, if the instruction had not been given, that the full amount of whatever verdict they might return could be collected from each defendant, making the full recovery double the verdict.

This defense impresses us as lame and unconvincing. Respondent says the instruction was given in Shaffer v. C., R. I. & P. Ry. Co.,

300 Mo. 477, 254 S. W. 257; Youtsey v. C., R. I. & P. Ry. Co., 251 S. W. 468, and Youtsey v. C., R. I. & P. Ry. Co. (Mo.), 259 S. W. 771. ·An examination of these cases shows no point on the instruction was made in any of them, at least there is no reference to it in the opinions. We shall not say there never are circumstances in which it would be proper to tell the jury how a plaintiff can collect his money after verdict and judgment, though we think of none, but certain it is there was nothing in the facts of this case calling for such a direction. Ordinarily in an action against joint tortfeasors the ·rights of the co-defendants as between each other are not at issue. [Kinloch Telephone Co. v. City of St. Louis, 268 Mo. 496, 188 S. W. 182.]

Still we are unable to hold the error was so prejudicial as to call for a reversal and remanding of the cause. It happens in this case that one issue was submitted to the jury imposing a liability on the corporate defendant alone, namely the issue as to the defective crossing; and it was that issue which the appellants say was the keystone of respondent's case. They admit there was enough evidence to take that issue to the jury, and deny there was substantial evidence warranting the submission of the humanitarian doctrine and the failure to sound statutory signals. The trial court gave instructions submitting three forms of verdict, one against both defendants, one for the plaintiff against either defendant and in favor of the other, and one for both defendants. The jury found against both defendants. It therefore appears they deliberately refused to favor the individual defendant by finding against the corporate defendant alone, when the road was open to them to do so on the strongest evidence the respondent presented, according to appellants' theory.

Neither can it be said the jury was encouraged by the instruction to return a larger verdict against both defendants than they would have returned had they not received the intimation that the corporate defendant could be made to pay the whole judgment. In their brief, appellants' counsel say they make no complaint about the size of the verdict, and that under the evidence as to the respondent's injuries— a broken hip and injured back—a very much larger verdict would have been justified. But appellants contend the size of the verdict and the fact that only nine of the jury concurred therein are not to be taken as evidence that the jury intended to deal fairly with the parties. They say these circumstances indicate, rather, the case was regarded as doubtful on the question of liability, and that, being given to understand by the instruction a verdict against the individual defendant was merely a matter of form, they went ahead nevertheless and returned a verdict against both defendants which was really aimed at the corporate defendant. That gets back to the original proposition. Appellants' criticism is predicated mainly on

the assumption that the average jury is actuated by an improper prejudice in such cases as this; and while we may not indulge in speculation as to how and why the jury arrived at the verdict reached in this case, the fact remains that they might have given a verdict against the corporate defendant alone based on substantial evidence, whether or not actuated by improper motives. They did not do it. This leads us to the conclusion that the instruction was not prejudicially harmful in the case at bar.

IV. Appellants' final assignment is that the argument and conduct of respondent's counsel during the trial were improper and prejudicial. The motion for a new trial complains only of improper argument, and contains no specification of misconduct during the reception of evidence, so we must disregard transgressions of the latter character, though illustrated by quotations from the bill of exceptions covering some eleven pages of the brief. Two extracts from the closing argument of counsel for respondent are set out as the basis for this assignment.

In the first, counsel for respondent, Mr. Cross, engaged in extended and persistent comment on the instructions, telling the jury he had written the instructions on his side; that he had given the defendants the benefit of every doubt; that he had to do so because if any error as big as the end of his little finger crept in it would be ground for reversal in the appellate court. Then he told the jury if they found any conflict or discrepancy in the instructions to remember errors in his instructions would result in a reversal in the higher court, whereas, if they should find for plaintiff and there were error in defendants' instructions, the plaintiff could not appeal.

Three times during the course of these remarks counsel for appellant made objection to the court and in each instance the objection was sustained. Twice the court told the jury that the instructions as given were the court's instructions. At the conclusion of the argument above quoted counsel for respondent passed on to other points in the case. Appellants' counsel did not request the court to reprimand counsel for respondent, nor move that the jury be discharged.

The other part of the argument complained of referred to the seventy-pounds air-pressure carried by the appellant railway company in the air brakes apparatus on the train in question. Respondent's counsel repeatedly charged the railway company with direct or primary negligence in failing to have sufficient pressure to permit of an emergency application of the air brakes following a service application shortly previous. No such specification of negligence was in the petition. The evidence concerning the air-pressure was introduced by appellants only as a defense under the humanitarian

232

doctrine, on the theory that it tended to show the engineer could not have averted the accident after he saw the respondent in a position of peril. It is true, however, that earlier in the trial respondent in making out his case had shown by two experts, without objection, the standard air-pressure on other railroads was ninety pounds for freight trains and one hundred and ten pounds for passenger trains. This argument, as quoted in the brief, covers two and a half pages. Seven times counsel for appellant made objection that it was not within the issues made by the pleadings and each time the objection was sustained by the court. In sustaining these objections six times the court expressly ruled the argument was not within the pleaded issues; once the court instructed the jury to disregard that part of the argument, and three times admonished counsel to stay within the issues. There the matter dropped. Counsel for appellant did not ask the court to reprimand counsel for respondent and did not move that the jury be discharged.

We are of the opinion that the argument in both instances was improper. The discussion of the instructions, it seems to us, was pointless as well and really had no bearing on the ultimate outcome of the case. But in every instance the court sustained the appellants' objections and did all that was requested. No exceptions were preserved, none could have been, because every ruling was in appellants' favor. They permitted the case to proceed to the jury with matters standing as they were, and we are not prepared to say, in this state of the record, that the cause should be reversed and remanded. Indeed, the authorities are that absent an adverse ruling, and an exception saved thereto, there is nothing before this court for review. [Anderson v. Sutton (en Banc), 293 S. W. 773; Adams v. Q., O. & K. C. Railroad Co., 287 Mo. 535, 229 S. W. 790; Kersten v. Hines, 283 Mo. 634, 223 S. W. 586.] Aside from that, in our view the case was not so close on the facts as to indicate the verdict was the result of passion and prejudice and the size of the verdict does not point to that conclusion. A large measure of discretion is reposed in the trial court in passing on such matters and under numerous holdings of the appellate courts of this State we would feel unwarranted in disturbing the result reached.

Our conclusion is that the judgment should be and it is hereby affirmed. *Lindsay* and *Seddon, CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.