ALVIN D. McDANIEL v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, a Corporation, Appellant.—92 S. W. (2d) 118.

Division One, March 10, 1936.

*Luther Burns, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

*Cope & Hadsell, Cowgill & Popham* and *John F. Cook* for respondent.

COLLET, J.—Appeal from the judgment of the Circuit Court of Caldwell County awarding plaintiff $14,000 damages for personal injuries. Plaintiff, an employee of defendant Chicago, Rock Island and Pacific Railway Company, was injured at Dodge City, Kansas, while in the discharge of his duties as a brakeman, incident to the transportation of freight in interstate commerce.

On the evening of February 17, 1932, the plaintiff, another brakeman named Talbot, a yard clerk named Kitson, an engineer, a fireman and a conductor left Bucklin, Kansas, with an engine, tender, and a coach which served as a caboose, for the purpose of going from Bucklin to Dodge City to pick up a carload of eggs for shipment from Dodge City, Kansas, to Buffalo, New York. The train arrived at Dodge City shortly before eight P. M. Arriving at the depot at Dodge City the train crew received instructions relative to the location of the car of eggs and, leaving the conductor and the coach at the depot, the engineer, fireman, Talbot, Kitson and the plaintiff proceeded with the engine to pick up the car. The engine and tender were backed east down an industry track which ran east and west and on which the car had been placed ready for shipment. The rear of the tender was equipped with a "footboard" or "runningboard" divided in the center by the coupler. Plaintiff and Kitson were riding upon the south section of the footboard, Talbot on the north section, and the engineer and fireman in the cab. Approximately 350 feet west of the point of the accident the industry track crossed another of defendant's tracks, referred to as the Hardesty Street crossing. A switch, connecting another sidetrack with the industry track, was located a short distance east of the Hardesty Street crossing. It was dark and there were no lights on the rear end of the tender except a red light in the center and the small electric lanterns that each of the three men carried. These lights made objects visible only a few feet from them, plaintiff fixing this distance at approximately three feet. An ice wagon had been left near and on the south side of the industry track with the tongue of the wagon extending out over the track. It does not appear from the record who was responsible for leaving the wagon in that position. When the engine and tender were approximately twenty to twenty-five feet from the wagon tongue Talbot saw the obstruction and immediately called out to plaintiff and Kitson to look out and at the same time with his lantern signaled the engineer to stop. Kitson scrambled up on the coupler. Plaintiff "ducked" but the wagon tongue struck him slightly below the knee, fracturing both bones of the right leg. Kitson reached down and caught plaintiff, preventing his falling under the tender.

Plaintiff's petition charged negligence in three particulars. First, that the defendant was negligent in not having the rear of the tender equipped with a headlight; second, that the speed at which the engine was operating at the time of the injury was excessive and in violation of the established custom and practice of the defendant; third, the failure to warn plaintiff of the danger. The trial court overruled defendant's demurrer to the evidence and submitted the case to the jury only upon the assignment of negligence charging excessive speed. The jury returned a verdict for $18,500. On

motion for new trial the court directed a *remittitur* of $4500. The formal *remittitur* being made, the motion for new trial was over-ruled and defendant appealed. Appellant presents three questions for determination. First, that plaintiff's Instruction P-1 which au-thorized a recovery based upon the speed of the engine should not have been given because (a) the evidence did not show that the speed of the engine was the proximate cause of the injury and (b) because the plaintiff assumed the risk of any injury resulting from the speed of the engine; second, that defendant's general demurrer to the evidence should have been sustained; third, that the evidence did not justify plaintiff's Instruction P-3 which permitted a recovery for hospitalization, medical and surgical bills. Additional facts neces-sary to the determination of these questions will appear hereafter. The questions presented will be considered in the order stated.

█ Appellant admits that the maximum speed at which the engine could be safely operated on the industry track was six miles per hour and that respondent's testimony was sufficient to sustain the charge that the engine was being operated at a negligent rate of speed at, and for a distance of approximately 300 feet west of the point of the accident, but asserts that the speed of the engine was not shown to be the proximate cause of the injury. It is axio-matic that a verdict cannot be based on surmise or conjecture but that the negligence proved must be shown to be the proximate cause of the injury. Appellant argues that since there is no evi-dence indicating that, if the engine had been traveling at six miles per hour, respondent could or would have done anything other than that which he did, the excessive speed of the engine cannot be said to have been the proximate cause of the injury. The evidence does not support the argument. Respondent testified:

"Q. . . . And since you were on the stand a question has come up here about men getting on and off of the engines that are moving within the yard limit 5 to 6 miles an hour. Anything dif-ficult about that, a man getting off of it? A. I suppose not, no sir.

"Q. And if it is within the yard limit going 5 or 6 miles an hour and you see an object 20 or 25 feet ahead any difficulty about step-ping off? A. No, sir, not a bit.

"Q. Now, at the speed this engine was going could you get off, before the accident, could you get off of that safely at all? A. No, sir, at no time. . . ."

Appellant's expert witness Glick testified:

"Q. Mr. Glick, of course, in your long railroad experience pos-sibly you're somewhat familiar with safety measures and the purpose of them? A. I believe so, yes, sir.

"Q. Where they have a 6 mile yard limit in the yards? A. Yes.

"Q. And are required to keep it within 6 miles the purpose of

that rule is the safety of the men and the property. That's the purpose of such a rule? A. Yes.

"Q. So that an engine going a little more than 5 miles an hour, going 5 to 6 miles an hour, if a man sees an obstruction 15 or 20 feet away and is an experienced railroad man, at such slow speed all he has got to do is step off and avoid it at such slow speed? A. Yes, could if he so minded."

Under this state of facts we cannot say as a matter of law that the operation of the engine at the concededly proper rate of speed of 6 miles per hour would not have prevented the accident. [State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S. W. (2d) 864; Gann v. Chicago, R. I. & P. Ry., 319 Mo. 214, 6 S. W. (2d) 39; Anderson v. Asphalt Distributing Co. (Mo.), 55 S. W. (2d) 688, 695.]

Appellant further contends that even if the speed of the engine was the proximate cause of the injury respondent assumed the risk of any injury resulting from excessive speed and hence, for that reason, the instruction should not have been given. In determining that question the Federal rule must be applied. That rule is well stated in Martin v. Wabash Ry. Co., 325 Mo. 1107, l. c. 1122, 30 S. W. (2d) 735:

"In cases arising under the Federal Employers' Liability Act, the Federal courts hold that an employee, in entering upon a contract of employment, assumes all the risks and dangers ordinarily incident to his employment, and also the extraordinary risks caused by the employer's negligence which are obvious and fully known to the employee and appreciated by him, or so plainly observable that he must be presumed to know them. [Boldt v. Pennsylvania Railroad Co., 245 U. S. 441, 445; Toledo, St. L. & W. Railroad Co. v. Allen, 276 U. S. 165, 169; Delaware, L. & W. Railroad Co. v. Koske, 279 U. S. 7, 11; McIntyre v. Railway Co., 286 Mo. 234, 256; Osborn v. Railway Co. (Mo.), 1 S. W. (2d) 181, 188.]" See, also, Patrum v. Railroad, 259 Mo. 109, 168 S. W. 622.

Since it is admitted that appellant's rules prohibited the operation of the engine on this track at a speed in excess of six miles per hour and that the speed at which respondent's evidence showed the engine was being operated was a negligent and unusual rate of speed, any risk incident to the excessive and unusual speed of this engine was not one ordinarily incident to respondent's employment and hence was not assumed by him as such.

Was it an extraordinary risk caused by the employer's negligence which was obvious and fully known to the employee and appreciated by him, or so plainly observable that he must be presumed to know it? We think not. Respondent testified that at the Hardesty Street crossing approximately 300 to 350 feet west of the point of the accident the speed of the engine was approximately six miles per hour but that at this point the speed was gradually increased until,

at approximately 150 feet west of the point of the accident, it was traveling at a speed of from fourteen to fifteen miles per hour, which speed was maintained until the engine struck the wagon tongue. He says that he realized the speed was in excess of the speed permitted by the appellant's rules and that if there was an obstruction on the track "there would be trouble," but that he felt no concern until "possibly a second" before Talbot's warning when the engine tender was approximately twenty to twenty-five feet from the obstruction. It is clear that neither of the three men on the footboard knew of any obstruction until Talbot's warning, when respondent says it was too late at the speed the engine was traveling for him to do anything to avoid his injury. Respondent and Kitson both stated that Talbot's warning and the collision were almost simultaneous. Respondent admitted that he could have given a signal to slow down which, assuming the fireman was at his post, would have been relayed to the engineer in the space of time the engine would have traveled fifty feet at the speed it was traveling 150 feet west of the place of the accident. After Talbot's signal the engine was stopped within sixty-five feet. It appears from the testimony of appellant's witness Talbot that he was in charge of the movement of the engine and that it was his duty to give the necessary signals to the engineer.

It is clear from respondent's testimony that he realized there was a possibility of danger, which possibility would have been a certainty and the danger obvious had the obstruction been obvious. But it also clearly appears the obstruction was neither obvious nor known to respondent. We do not understand that the realization of a possibility of danger amounts to a realization of a danger "obvious and fully known . . . or so plainly observable that one must be presumed to know them." If such was the rule an intelligent employee with a vivid imagination could be said to have assumed the risk of any injury which his informed intellect had conceived a possibility of. What has been said above disposes of appellant's contention that its demurrer to the evidence should have been sustained.

The only remaining question is the propriety of the instruction authorizing a recovery for expenses in the nature of physicians' fees. Appellant contends the evidence did not show that respondent had incurred an obligation to pay such expenses.

The evidence on that question showed that respondent had been presented with a bill from a hospital for $209.35 and that it was necessary for him to expend approximately $28 per month from September, 1932, until the date of the trial in February, 1933, for surgical supplies. These items were not disputed. In addition, at his request he was treated by four physicians and surgeons who testified that the reasonable charge for their services were as follows: Dr. Mier, from $250 to $300; Dr. Donaldson, $250; Dr. Feist, $700; and Dr. Hess, $900 to $1000. Dr. Hess testified that at least three

additional operations would be necessary and that the future expenses would probably be as great as they were up to the time of the trial. The instruction authorized a recovery on account of all such expenses of an amount not exceeding $3325. Appellant's position is that the testimony of the doctors did not show that they had in fact charged, or that plaintiff had become obligated to pay them anything. The fact that the services were actually rendered is not disputed. This question arose in the case of Mirrielees v. Wabash Ry. Co., 163 Mo. 470, 63 S. W. 718, where we said, l. c. 724:

"The evidence is that the plaintiff was treated by several physicians, at his request, among them Dr. Payne, who testified that his services were reasonably worth $200. Under these circumstances, the plaintiff had become liable, under an implied *assumpsit*, to pay to Dr. Payne the reasonable value of his services. This fills the requirements of the rule laid down in Smith v. Railroad Co., 108 Mo. 251, 18 S. W. 971, and in Robertson v. Railroad Co., 152 Mo. 393, 53 S. W. 1082."

In the later case of Haney v. St. Regis Mining & Smelting Co. (Mo. App.), 205 S. W. 93, in passing upon the propriety of a similar instruction the St. Louis Court of Appeals held:

"The evidence is that plaintiff was first treated by a doctor furnished by defendant; that later Dr. Carpenter treated him for some time. Defendant in its abstract of record summarizes Dr. Carpenter's evidence by saying that he 'testified as to plaintiff's injuries, and that reasonable compensation for the service rendered plaintiff would be $200.' . . . Similar instructions were approved in Carter v. Baldwin, 107 Mo. App. 217, 227, 81 S. W. 204; Hannon v. Transit Co., 102 Mo. App. 223, 77 S. W. 158, and Mirrielees v. Wabash Railroad Co., 163 Mo. 470, 63 S. W. 718."

There was ample evidence to support the instruction. The judgment should be affirmed. It is so ordered. All concur.