James L. Rowe v. Missouri-Kansas-Texas Railroad Company, a Corporation, Appellant.—100 S. W. (2d) 480.

Division One, December 14, 1936.

*Carl S. Hoffman* and *Pendleton & Martin* for appellant.

*Wendell W. McCanles* and *Ronald Shankland* for respondent.

FERGUSON, C.—Plaintiff was employed by defendant railroad company as a brakeman. While acting in that capacity as front or head brakeman on one of defendant's freight trains enroute from Kansas City, Missouri, to Parsons, Kansas, and points in Kansas, Oklahoma and Texas, he sustained an injury to his right eye which resulted in the loss and removal of that eye and a "sympathetic" impairment in the vision of the left eye whereby the vision in that eye was reduced to one-fifth of normal with a permanent, progressive condition existing indicative of an ultimate complete loss of vision. Plaintiff brought this action, for damages for the injury, under the Federal Employers' Liability Act. The action was instituted and tried in the Circuit Court of Cooper County and resulted in a jury verdict, and a judgment thereon, awarding plaintiff damages in the sum of $12,000 and defendant appealed. It is admitted, "that plaintiff was engaged in interstate commerce at the time of the alleged accident" and therefore that the Federal Employers' Liability Act applies.

An understanding of the assignments appellant makes necessitates first a statement of certain facts in evidence. The locomotive in use on this train was an "oil burner." The evidence is, that at frequent intervals the "flues" of an "oil burning engine" "become stopped" or clogged "with soot and refuse from the firebox" which causes the engine to "lag" and "not steam" properly and that to remedy such condition the fireman must periodically "sand the engine to clean out the flues." In "sanding an engine . . . the best results are obtained when the engine is working at capacity" and defendant's road foreman of engines stated: "You should sand with an open throttle, it requires force to pull that sand through the flues." The evidence further shows that the "sanding" is usually and "customarily" done "while pulling up hill." An expert witness for plaintiff said in this connection: "At times soot accumulates on the flues of the locomotive and retards the heat and they admit

sand at high velocity to clean out these flues and the harder the engine is working . . . the more apt the engine is to clear itself" and "it is customary to sand an engine on the road at the hardest working points." The sanding operation is described by plaintiff in this way; that "there is a flap on the firebox door, 3 or 4 inches in diameter and the fireman pours the sand in (the firebox) with a sand horn and the draft carries the sand through the flues and out the smokestack and cleans the flues of any soot and refuse;" that "from 3 to 7 or 8 horns of sand are put in at one time" and "it takes from 3 to 5 minutes" to put the sand into the firebox; that black smoke and black sand is emitted or comes out of the smokestack and goes back over the train; and that "after the last horn of sand has been put into the engine it takes from 30 seconds to a minute for the smoke to clear up." Defendant's witness, the fireman on the train at the time the plaintiff alleges he sustained the injury, describes the sanding of an engine in this way: "We wait until . . . the exhaust is close enough together so it will make a continuous draft through the firebox. We have a little hole in the fire door and take sand out of the sandbox with a funnel shaped horn which we dip full of sand and hold up to the hole and let the sand run down slowly through the firebox; the sand passes through and takes out soot and anything that is in the flues. The engineer usually watches the stack to see when the black smoke quits coming out and when it quits he tells the fireman or gives him a sign and the fireman stops" and "when the soot is all out, the smoke clears up." All the evidence is to the effect that while the sanding operation is in progress a mass or large quantity of black sand, soot and smoke is emitted from the smokestack and passes back over the train. Plaintiff's evidence is to the effect that practically all the sand put into the firebox passes out or is ejected from the smokestack at the time or while the sanding operation is in progress, though it is conceded that particles of sand will "lodge" here and there and will at times, as they may be dislodged and get into the line of draft, be thrown out through the smokestack. The fireman further stated: that "we usually sand going uphill;" that "we do not sand in the towns" nor "in city limits," "we wouldn't throw sand in peoples eyes if we knew it;" and that "we wouldn't sand where there are any houses or anything along the track, we wouldn't do that."

Having attempted to describe, in the language of the witnesses, what is meant by sanding an engine, we shall now relate the evidence as to how the injury occurred, which the trial court, upon defendant's motion for a directed verdict offered at the conclusion of all the evidence, held sufficient to make an issue for the jury while defendant claims that no actionable negligence was shown and that it conclusively appears that the injury claimed resulted from one

of the ordinary risks of plaintiff's employment. This freight train left Kansas City, Missouri, on a regular trip, September 2, 1931, with plaintiff working as head or front brakeman. His run was from Kansas City, Missouri, to Parsons, Kansas, where he resided. He was at that time thirty-nine years of age and had been employed as a brakeman on defendant's lines for fifteen years. As front brakeman he rode "on the rear of the tank" where he sat with his back toward the engine, facing toward the train, in a position from whence he could "watch his train for hot boxes around curves and everything in general;" that "is the customary position" for the "head brakeman while the train is moving." It was the duty of the head brakeman and engine crew to look for the position of the signal board at certain stations where train orders were customarily received and delivered. If the signal showed that orders had been received for that train it was customary for the "engineer in approaching the station to close the throttle and drift along until" the head brakeman, or the fireman, standing in the "gangway" of the engine "picked up" the order from the station operator standing on the ground, who would "hand it up on a hoop." The brakeman or fireman receiving the order would detach it and throw the hoop to the ground. The plaintiff testified; that on this trip the engine was "sanded" at the "customary places" prior to reaching a hill north of and near Moran, Kansas, which was also a "customary place" for sanding; that the train reached this point "around 5:30 or 6 o'clock" in the evening; that after the top of the hill is reached "there is a curve coming into Moran and then the track becomes level" and continues south to the Moran station; that the engine was sanded as it went up this hill north of Moran; that after the train passed over the top of the hill he looked for the "order board" at Moran and saw that it "was out;" that it "was his duty to go down into the gangway of the engine" and "pick up the order;" that "the engineer cut off his engine . . . and was drifting into Moran expecting the operator there to come out and hand up the order;" that he got up from his position, "on the rear of the tank," and started walking "over the oil tank," facing then toward the south, to go "down into the gangway to receive the order;" that "there is a handrail directly in the middle of the tank" and he grasped this with his left hand as he walked south over the top of the tank toward the gangway of the engine; that his "head was above the cab of the engine, toward which he was facing and walking, and "3 or 4 feet higher than the smokestack;" that when he was "about the center of the tank—about half way over—the engineer," without any warning, "jerked his throttle open and caused the wheels of the engine to spin on this level track" and that a mass or large quantity of "dense black smoke," black sand and soot was "thrown

out" of the smokestack and "a bunch of it" struck him in the face "before" he "could cover up;" that his face was "soiled" and begrimed with "this smoke, dirt and stuff;" that he felt and continued to feel a "stinging" and "burning sensation" about the face; that "there was a burning sensation in the right eye" which "caused" him to close his eye and he "couldn't hold it open;" that he "got down and got the order, with the right eye closed, and delivered it to the engineer and after the order had been read" he "returned to" his position on the rear of the tank and that his right eye continued "watering considerable." Plaintiff's evidence was that, under the conditions existing at that time, the opening of the throttle and spinning of the wheels was a "very unusual" and unexpected act while defendant's evidence was that it did not occur, that there was no occasion at the time for the engineer "to open his throttle wide enough to spin the wheels of the engine" and to do so would have been "a negligent act" which would have had a tendency to "pull out a drawbar" or might "tear up his train." Defendant's witnesses concur in saying that the most or "larger volume" of sand placed in the firebox comes out the smokestack during the sanding process; that small particles lodge in the firebox and in the smokebox and may come out at any time while the train is in motion upon becoming dislodged, "falling into the line of draft and coming out with the draft." Plaintiff's expert witness Concannon says the opening of the throttle and spinning of the wheels "increases the velocity of the draft." Defendant's engineer stated that in the sanding operation "the amount of sand that will escape depends on the amount of draft" and "the harder you work an engine the better it cleans the flues," J. H. Henley, defendant's "road foreman of engines," testified; that, "you should sand with an open throttle—it requires force to pull that sand through the flues;" that under the conditions existing at the time "the spinning of the wheels would not carry sand out of that locomotive" unless sand was being applied at the time; that if "sand came out in large quantities it would indicate he (the fireman) had put in some more sand;" that unless the sanding process was going on, increasing the draft would not throw out enough sand which might theretofore have lodged in the firebox or smokebox "to cloud the smoke or cloud the stack;" and that suddenly "increasing the speed of the wheels would not have a tendency to throw sand out unless he (the fireman) was down there with the sand horn and was putting it in there." Defendant's brakeman Thomas was asked: "Occasionally there may be some sand come out but you wouldn't expect it ordinarily in so large a volume except sometime during the process of sanding?" He answered: "No, I wouldn't, exactly." We would recall here the testimony, of one of defendant's expert witnesses, that "an oil burning engine

does not smoke unless the fireman does something to cause it; that is a pecularity about oil burning engines—they do not smoke unless something out of the ordinary happens such as a man changing his firing position or sanding—outside of that they won't smoke." Plaintiff could not see the engineer or fireman from where he was sitting on the rear of the tank nor as he went across or over the tank intending to get down into the gangway of the engine and when asked if during, or immediately prior to, that time they poured "sand into that engine again," answered: "I couldn't tell you," but plaintiff did describe what occurred; the opening of the throttle, the spinning of the wheels, the resulting blast of dense, dark smoke and a mass of black sand and soot from the smokestack striking him in the face "soiling" and "spotting" his face and causing a burning and stinging sensation about his face and in his eyes.

While plaintiff's testimony is that the engine was sanded as it was "pulling up" the hill north of Moran it seems to be his theory that while in Moran and on the stretch of level track further sanding was done during which this blast or "bunch," as he describes it, of black sand, soot and black smoke was thrown out of the smokestack against his face causing the injury to his eyes. On a demurrer to the evidence we must take plaintiff's positive testimony as true and accord him all favorable, reasonable inferences, which arise upon the whole evidence; so considering the testimony; the opening of the throttle, the spinning of the wheels and the resulting blast of black smoke, soot and mass, or large quantity, of black sand from the smokestack, in the light of the whole evidence, indicates, and affords reasonable ground for the inference, that either another and further sanding operation was then being made, the one at the hill perhaps not being deemed sufficient, or that there was a continuance of the operation commenced on the hill which for some reason was not completed at that time; and that such last sanding operation was made at an unusual place, in an unusual manner and contrary to custom.

Defendant's witnesses testified that there was neither a custom nor a company rule requiring "the engine crew to give the train crew any warning they are going to sand the engine." On this question the following developed on the cross-examination of plaintiff: "Q. Is there any rule or any custom that an engine crew is supposed to give the train crew warning when they are going to sand the engine? A. I don't know of any rule but some of our engineers do.; we have some engineers that will warn you when they are going to sand." On redirect examination the following question and answer appears: "Q. Do you know whether there is a rule requiring them to do it (warn before sanding) where you are out on top of the train? A. There is a custom for the engineer to call your attention with the whistle."

But in the instant case we have the positive testimony of the engineer, defendant's witness, that on this trip he "knew" plaintiff "was sitting on the back of the tank;" that "it was his customary place to sit;" that he "could look out the side window" of the cab "and see" plaintiff sitting "on the back of the tank;" that when he saw the signal "indicating that there was an order" at Moran he "looked back to see if he (Rowe, the plaintiff) was there and would get the order" and "saw him get up and start back;" that he "knew Rowe would have" to "walk the length of the tender" or tank "to get into the cab" and pick up the order; that he "knew he (plaintiff) was up there . . . on the tender coming towards the cab." The engineer denies that he opened the throttle and caused the wheels of the engine to spin but if plaintiff's positive evidence be accepted that was done and the dense, dark smoke and a mass of black sand and soot was thereupon thrown from the smokestack when he was about "half way over" the tank. The engineer admits that he saw plaintiff "get up and start back" and knew he was walking south over the tender, facing the smokestack, intending to get down into the gangway and pick up the order. Yet with this knowledge no warning was given, or attempted, that a sanding operation had been commenced or was about to be commenced or resumed at this unusual and unexpected time and place on a level track and in a town, contrary to custom.

Upon arrival at Parsons, Kansas, "around 7 or 7:30 in the evening" plaintiff "got an order to the doctor for the purpose of having this eye looked at . . . but couldn't get hold of the doctor that evening." He saw the doctor "about 9 o'clock the next morning." The doctor took a particle of black sand out of the right eye and "washed out" both eyes. This was the commencement of treatment by several doctors and at hospitals over a long period of time; the result we have noted. No evidence was offered tending to minimize the nature, extent or severity of the injury nor is it claimed that the verdict is excessive if liability on the part of the company exists.

Originally plaintiff's petition contained six specific charges of negligence, separately designated, "A", "B", "C", "D" "E", and "F". Upon defendant's motion the trial court, before the trial commenced, struck out paragraphs "B" and "C". At the conclusion of all the evidence plaintiff dismissed as to the allegations of negligence set out in paragraph "A" and at defendant's request the court gave its instruction numbered 2 withdrawing from the consideration of the jury the allegation of negligence set out in paragraph "E" of the petition. This restricted the allegations of negligence to those set out in paragraphs "D" and "F", the substance of which is, that "defendant, its agents, servants and employees" were negligent in that; (D) though they knew plaintiff "was passing over the tender

of said engine" at the time and "knew the danger" to which he was then exposed, they "carelessly and negligently and without any notice or warning and without any regard to the rights of this plaintiff, and contrary to a long-established custom and practice well known to defendant's employees, while sanding an engine, applied steam to said locomotive in such manner as to cause the wheels of the locomotive to spin and cause . . . said locomotive to suddenly throw out a great quantity of hot sand, oil, soot and sparks, causing the same to strike and enter plaintiff's right eye," etc.; (F) "although it is contrary to a long and well-established custom well known to the defendant and its employees not to sand an engine while approaching and entering a city, yet the said defendant through its engineer and fireman, carelessly and negligently sanded the aforesaid engine while they were approaching and entering the city of Moran, Kansas, and at said time and place without notice and warning to the plaintiff and contrary to the long and well-established custom and practice not to do so, the defendant's engineer and fireman in charge of said engine carelessly and negligently applied a large amount of steam and carelessly and negligently caused the wheels of said locomotive to spin and carelessly and negligently caused, allowed and permitted a large amount of hot sand, soot and oil to be thrown and emitted with great force and violence from said locomotive and caused same to strike against the plaintiff's face and eyes and a hot particle of said mixture to enter the plaintiff's eye causing him to be injured as aforesaid."

The gist of the allegations of paragraphs "D" and "F", read together, is that, though defendant's servants and employees, plaintiff's fellow employees, well knew that plaintiff was upon the tank car, walking over the top thereof toward and facing the cab and smokestack of the engine and in that position exposed to the blast of sand, soot and smoke which is thrown out of the smokestack when the engine is sanded, they nevertheless, without any warning to him, sanded the engine on the level track and in a town, contrary to custom and practice, and that sand was forced through the flues and out of the smokestack by the action of the engineer in applying "a large amount of steam to the locomotive (by opening the throttle, as shown by the evidence) in such manner as to cause the wheels of the locomotive to spin" and thereby cause the sand, soot, etc., to be thrown out of the smokestack upon and against plaintiff causing the injury complained of.

Defendant as appellant assigns as error; (1) the refusal of the trial court to give its instruction directing a verdict in its favor, in the nature of a demurrer to the evidence; (2) the refusal of the trial court to give instructions offered by it withdrawing the foregoing allegations of negligence, "D" and "F", of plaintiff's petition; and

1154

(3) the giving of plaintiff's Instruction A, upon the whole case, authorizing a verdict for plaintiff. Assignments 1 and 2 may be considered together.

The first and second assignments are resolved to this, that the court erred in refusing to direct a verdict in defendant's favor, at the close of all the evidence, and in submitting the case to the jury. In support of this contention defendant's first argument is summed up in this way: "Plaintiff, having pleaded that his injury happened at the time that the engine was sanded, must prove that his injury occurred during the sanding process, and not at some other time. He must also prove, having alleged that the slipping of the engine wheels occurred during the sanding operation, that they did slip during that sanding operation and not at some other time." It suffices to say that we have heretofore set out the evidence, from the viewpoint most favorable to plaintiff, and it sufficiently appears therefrom that there is substantial evidence tending to show that "his injury occurred during" a sanding process and that the spinning (as generally spoken of in the testimony) of the engine wheels "occurred during" a sanding operation.

The propositions that in a case of this nature liability must be predicated upon negligence, that a causal connection must be established between the injury and the negligence charged, and that plaintiff's case must be made out by substantial evidence and cannot be sustained by a mere scintilla of proof, require no citation of authority. Without further analyzing the evidence, which on this demurrer must be viewed in the light most favorable to plaintiff, we are of the opinion there is sufficient substantial evidence to make a case for the jury on the issue of negligence on the part of defendant's enginemen. But appellant would have us declare, as a matter of law, that the injury was the result of an ordinary risk incident to plaintiff's employment which he assumed and assumption of risk being a defense under the Federal Employers' Liability Act that no case was made for the jury. It seems to be the theory that the evidence conclusively shows that neither custom nor company rule required any warning to be given that a sanding operation was to be made and that the risk incurred from sand thrown out of the smokestack, either during the sanding operation or small particles which from time to time fly from the smokestack of an oil burning engine, is one of the ordinary risks of the employment which trainmen assume. Disregarding plaintiff's testimony that when a trainman was on top of the train "there is a custom for the engineer" to give warning of a sanding operation "with a whistle" and taking the evidence as above stated it also appears, that there were usual and customary places for sanding; that usually the sanding was done as the engine was "pulling up hill;" that it was an unusual and careless act to

suddenly open the throttle and apply steam in an amount sufficient to spin the wheels of the engine when drifting on a level track as in this instance; that the sanding of the engine on a level track, at a time and under the conditions shown to exist, in a town and after the engine had commenced to "drift" was most unusual, exceptional, unexpected and contrary to custom. Any risk from sand arising from the sanding of an engine on the road, in the usual manner and at the customary places might well be said to be such as is ordinarily incident to the employment. In such case the trainman perhaps most exposed would be the "head" or "front" brakeman riding on top of and at the rear of the tender or tank car but he is prepared and able to protect himself during the usual and customary sanding operation. He knows the customary places for sanding, is riding with his back toward the engine and the smokestack and if he has occasion to face in that direction at such time, knowing the operation was in progress, he could "cover up"—protect himself. Plaintiff testified that ofttimes during a usual and normal sanding operation sand thrown from the smokestack would strike against his back. Taking the evidence, and the inferences therefrom, most favorable to plaintiff, showing the sanding of the engine, the sudden opening of the throttle and application of steam sufficient to spin the wheels of the engine thereby forcing sand through the flues and throwing a mass of sand and a large volume of soot and black smoke from the smokestack, in a town, on a level track and after the steam had been shut off and the engine had commenced to drift, contrary to the usual custom and practice, without warning, and at a time when the enginemen knew plaintiff was walking across the top of the tank, facing the smokestack, exposed to the blast therefrom and not expecting such to occur, we think a prima face case of negligence on the part of defendant's enginemen, proximately contributing to the injury, was made.

The Federal rule as to assumption of risk applies. Citing authorities, it is stated in McDaniel v. Chicago, R. I. & P. Ry Co.. 338 Mo. 481, 92 S. W. (2d) 118: "The Federal courts hold that an employee, in entering upon a contract of employment, assumes all the risks and dangers ordinarily incident to his employment, and also the extraordinary risks caused by the employer's negligence which are obvious and fully known to the employee and appreciated by him, or so plainly observable that he must be presumed to know them." Here we are dealing with evidence, taken as true on the demurrer, showing an extraordinary risk or unusual danger caused by and arising out of the negligence of defendant's enginemen. It was a danger that was neither obvious nor timely observable, nor was it known or reasonably to be expected or anticipated and we cannot hold that plaintiff assumed a risk arising from an act of negligence on the part of defendant's enginemen which was unknown, not anticipated nor reasonably to be anticipated. [Brock v. Mobile and O. Railroad

Co., 330 Mo. 918, 51 S. W. (2d) 100, and Federal cases there cited; Norton v. Wheelock, 323 Mo. 913, 23 S. W. (2d) 142; and O'Donnell v. Baltimore & O. Railroad Co., 324 Mo. 1097, 26 S. W. (2d) 929.] We find no error in the action of the trial court in refusing the demurrer to the evidence and the withdrawal instructions.

Appellant's criticism of plaintiff's Instruction A, covering the whole case and directing a verdict for plaintiff upon a finding by the jury of the facts hypothesized, is two fold. First, it is said that it submits as an issue; that plaintiff was injured during a sanding operation and that defendant's engineer knew there was "sand and soot in said locomotive that would, by reason of the spinning of the wheels of said locomotive be forced violently out of said locomotive through the smokestack," and that there is no substantial evidence upon which to base the submission of such issue. That contention is disposed of by our ruling heretofore on the demurrer to the evidence. The second criticism is that the instruction is "too long" and "so involved" and "confusing" "that no jury could understand it." The instruction is lengthy, resorts to detail and unquestionably the matters submitted could have been stated in fewer words and in a more concise manner nevertheless it is not contradictory nor can we say it is obscure. It seems clear enough for "the attentive eye or ear" to follow without confusion or difficulty (Wolfe v. Payne, 294 Mo. 170, 241 S. W. 915) and "notwithstanding its length it was not likely to be misunderstood by the jury. Its mere length will not constitute error." [Walter v. Mo. Portland Cement Co. (Mo.), 250 S. W. 587; Johnson v. American Car & Foundry Co. (Mo.), 259 S. W. 442.]

Finding no reversible error the judgment of the trial court is affirmed. *Hyde* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.