E. J. DUTTON, Appellant, v. KANSAS CITY TERMINAL RAILWAY ASSOCIATION and CHICAGO & ALTON RAILROAD COMPANY.—292 S. W. 718.

Division Two, March 14, 1927.

1. **NEGLIGENCE: Contributory: Matter of Law.** In this case the trial court erred in sustaining a demurrer to the evidence on the sole ground that plaintiff, as a matter of law, was guilty of contributory negligence which precluded recovery for injuries he sustained when the truck he was driving was struck by a railroad train at a public crossing.

2. ———: ———: **Looking and Seeing: Question for Jury.** The court has no right to say, as a matter of law, that the testimony of a witness, riding on the truck struck by a train at a crossing, that he looked carefully in the direction from which the train came and saw no train coming, and that he could have seen it if he had been within the range of vision, was false. On the contrary, where the worst that can be said of his testimony is that probably the train was in sight when he looked and failed to see it, it is for the jury to say whether the testimony as to distance and probable rate of speed contradicted his positive testimony.

3. ———: ———: ———: **Speed of Train: Question for Jury.** Immediately east of a crossing in a switch yard a switch track branched off into a maze of tracks extending east for a long distance; twenty-two feet further north was an eastbound main track, and fifteen feet still further north was a westbound track. Plaintiff drove a truck north on the crossing, and his father sat to his right on the same seat, and the truck was struck by a train on the westbound or northermost one of the three tracks. Plaintiff's memory was obliterated by the blow. His father testified that they drove north, and at the switch track the truck stopped, and he looked east and could see along the westbound track for a distance of six or seven hundred feet, but saw no train coming from the east; that the truck then started, and he continued to look to the east until it got well up on the switch track; that then the attention of himself and plaintiff was directed towards the west, on the lookout for a train on the eastbound track; that they did not look further towards the east until the truck got upon the eastbound main track, where they could see there was no danger from the west; that by that time the front of the truck was almost upon the rail of the westbound track, and he suddenly discovered a train on that track bearing down upon them from the east, about a hundred feet away; that he called to plaintiff, who increased the speed and had got the truck across the westbound track when the engine struck the rear end of it; that there was no whistle or other warning signal; that the truck had been traveling approximately three miles an hour, "may be not that fast," and the train "at least twenty-five miles an hour." The ordinance limited the speed of trains to six miles an hour. *Held*, that, the attention of plaintiff being directed to the west until he got within the danger zone, the question whether he was negligent in assuming that the train would not run at a rate of speed so great and

dangerous as to collide with him while he traveled that short distance was a question for the jury, as was also the question whether plaintiff was negligent on the theory (a) that he did not look or listen for the approaching train or (b) that he did look and saw the train and attempted to beat it over the crossing.

**4. SPEED OF TRAIN: Obliteration of Memory: Amnesia: Question for Jury.**  Whether the statement of plaintiff, the driver of a truck struck by a train at a crossing, that he could not remember anything that occurred while the truck approached the crossing and knew nothing of the collision, was true, is a question for the jury; particularly so, where a physician testifies that the effect of the injury to plaintiff might have been to obliterate his memory of what occurred during a half minute or more just before the blow was struck.

**5. ————: Public Crossing: Clear Track.**  A vehicle crossing over railroad tracks, if used as a crossing by anyone who has occasion to use it, although it may have been established in the first instance for the convenience of a manufacturing plant, is a public way, and being such the engineer of a train on one of the tracks has no right to rely upon the presumption that the track is clear.

**6. ————: ————: Slacking Speed: Humanitarian Rule.**  Notwithstanding the engineer testifies that he came within view of the place of collision when the engine was six hundred feet or more from the place, and that his view of it was obstructed when he got within two hundred feet of it on account of his position on the right-hand side of the cab, evidence that the fireman sitting by him on the other side of the cab was in plain view of the crossing for six or seven hundred feet from the place of collision, and that if he had looked he would have seen a truck approaching the crossing, with the apparent purpose of entering upon the track, required that, in the exercise of ordinary care, some sort of warning should have been given, or the speed of the train slackened, the public having a right to use the crossing, and the engineer therefore having no right to rely upon the presumption that the track was clear; and if there is further evidence that if there had been a slight decrease in the speed of the rapidly running train the truck would have crossed in safety, and no attempt was made to slacken its speed, the question of defendant's liability, under a plea of facts bringing the case within the humanitarian doctrine, is one for the jury.

Corpus Juris-Cyc. References: **Railroads,** 33 Cyc., p. 965, n. 82; p. 1118, n. 96; p. 1126, n. 50; p. 1129, n. 68.

Appeal from Jackson Circuit Court.—*Hon. Thad B. Landon,* Judge.

Reversed and remanded.

*Cleary & Barnett* for appellant.

(1) Appellant starts with the presumption in his favor that he was using due care for his own safety, and that presumption remains with him and the burden is on the respondent to prove the contrary, unless the appellant in the submission of his evidence shows a state of facts which permit of no other possible inference than that he

was guilty of contributory negligence as a matter of law. Jewell v. Bolt & Nut Co., 231 Mo. 202; Hammack v. Hill, 212 Mo. App. 193; Schneider v. Power Co., 238 S. W. 468; Kennedy v. Railroad, 190 Mo. 424; Wentworth v. Duffy, 68 Mo. App. 513; McNown v. Railroad, 55 Mo. App. 585; Lamb v. Railroad, 147 Mo. 171; Kreis v. Railroad, 131 Mo. 533; Huhn v. Railroad, 92 Mo. 440. Whether a party is guilty of contributory negligence as a matter of law depends upon whether the court can say that, according to the evidence submitted by such party, reasonable men could not differ on the matter of his contributory negligence. Hanna v. Railroad, 178 Mo. App. 281; Nufer v. St. Ry., 182 S. W. 792; Stewart v. Railroad, 142 Mo. App. 322; Heine v. Railroad, 144 Mo. App. 443; Aleckson v. Railroad, 213 S. W. 894; Schulz v. Railroad, 223 S. W. 757; Minnis v. Brewing Co., 226 S. W. 999; Henderson v. Railroad, 248 S. W. 987 (2) No arbitrary standard of the length of distance for which a plaintiff might have had an unobstructed view of an oncoming train had he looked in that direction can be adopted as a test of contributory negligence. The question turns rather upon that old rule, did the plaintiff, under all of the circumstances as they existed in his particular case, exercise that degree of care for his own safety, which an ordinarily prudent and reasonable person would exercise under the same or similar circumstances, and that question is for the jury. Donohue v. Railroad, 91 Mo. 357; Hanshaw v. Railroad, 173 Mo. 459; Baker v. Railroad, 122 Mo. 533; Monroe v. Railroad, 280 Mo. 490; Kaemmerer v. Woods, 299 Mo. 247; State ex rel. v. Reynolds, 286 Mo. 222. The conditions surrounding the crossing at the time, the maze of tracks and the attendant confusion in the switch yards and the possibility of danger from the opposite direction, the view of which was obstructed, and the determination by the appellant when 35 feet from the track on which the collision occurred that there was no train approaching at that time from the east and the listening and continued listening of the appellant and his fellow rider for some signal of an approaching train, coupled with their failure to hear any, are all matters to be taken into consideration by a jury in determining whether the appellant under all the circumstances acted as an ordinarily prudent person might. Monroe v. Railroad, 280 Mo. 483; State ex rel. v. Reynolds, 286 Mo. 222. Appellant had a right to assume that respondent in approaching said crossing would in doing so keep a lookout for persons at said crossing and use ordinary and reasonable care to notify persons thereabout of the approach of respondent's train and use such care to avoid collision with any of such parties, and that respondent would comply with an existing city ordinance regulating the speed of trains at such crossings. Donohue v. Railroad, 91 Mo. 357; Kelley v. Railroad, 75 Mo. 138; Hardwick v. Railroad, 181 Mo. App. 169; Kaem-

merer v. Woods, 299 Mo. 247; Hale v. St. Ry., 287 Mo. 519; Murrell v. Railroad, 279 Mo. 108.    (3)    If the respondent saw, or by the exercise of ordinary and reasonable care could have seen, the appellant in a position of danger in time so that by the exercise of ordinary and reasonable care respondent could have notified appellant of its approach in sufficient time for appellant to have remained in or got to a position of safety, or so that by the exercise of ordinary and reasonable care respondent could have diminished the speed of its train in time to have permitted appellant to have cleared respondent's track, and failed to do so, then respondent is liable regardless of whether appellant was guilty of contributory negligence or not. Kelley v. Railroad, 75 Mo. 138; Lloyd v. Railroad, 128 Mo. 595; Hoffman v. Railroad, 180 S. W. 995; Zumwalt v. Railroad, 266 S. W. 717; Murrell v. Railroad, 279 Mo. 111; Murphy v. Railroad, 228 Mo. 56; Rolliston v. Railroad, 252 Mo. 525; McGinnis v. Railroad, 182 Mo. App. 718.    (4)    Respondent was under the duty of keeping a lookout for appellant and persons using the crossing.    Kelley v. Railroad, 75 Mo. 138; Lloyd v. Railroad, 128 Mo. 595; Hoffman v. Railroad, 180 S. W. 995; Zumwalt v. Railroad, 266 S. W. 717; Keele v. Railroad, 258 Mo. 62; McGinnis v. Railroad, 268 Mo. 667; Dalton v. Railroad, 276 Mo. 663; Ahnefeld v. Railroad, 212 Mo. 280; Murrell v. Railroad, 279 Mo. 92.    Where a well defined roadway crossing has been used by the general public for many years up until the time of the collision it matters not whether it has ever been formally dedicated or not.    It is for all of the purposes contemplated by a law limiting the speed of trains over public streets a public street.    Borders v. Glenn, 232 S. W. 1062; Clay Products Co. v. St. Louis, 246 Mo. 446; Dow v. Railroad, 116 Mo. App. 555; Cochran v. Wilson, 287 Mo. 210.

*Charles M. Miller* for respondent Chicago & Alton Railroad Company; *S. W. Sawyer* and *John H. Lathrop* for respondent Kansas City Terminal Railway Company.

The evidence for the plaintiff showed he was guilty of negligence as a matter of law, and there is no room for the last clear chance doctrine in the case.    Tannehill v. Railroad, 279 Mo. 158; Dyrcz v. Railroad, 238 Mo. 33; Rollison v. Railroad, 252 Mo. 525; Alexander v. Frisco, 289 Mo. 579; Porter v. Railroad, 199 Mo. 82; Evans v. Railroad, 289 Mo. 493; Sanquinette v. Railroad, 196 Mo. 466; Monroe v. Railroad, 297 Mo. 633; Beal v. Railroad, 256 S. W. 733; Underwood v. Railroad, 182 Mo. App. 252; McGee v. Railroad, 214 Mo. 530; White v. Railroad, 159 Mo. App. 508; Sullivan v. Railroad, 271 S. W. 983; Keele v. Railroad, 258 Mo. 62; Burge v. Railroad,

244 Mo. 76; Laun v. Railroad, 216 Mo. 563; State ex rel. v. Reynolds, 289 Mo. 479; Kelsay v. Railroad, 129 Mo. 362.

WHITE, J.—The plaintiff brought suit against the defendants for injuries received by him in Kansas City, in a collison of his truck with an engine of the Chicago & Alton Railroad Company. The trial court sustained a demurrer to the evidence at the close of the plaintiff's case, and he appealed.

The collision occurred March 31, 1920, early in the forenoon. The track upon which it took place belonged to the defendant, the Terminal Railway Company, and the defendant Chicago & Alton Railroad Company operated its trains upon it under a lease. The incident occurred in the yards at what was known as the Penrod crossing, an approach to the plant of the Penrod Corporation plant on the north side of the railway tracks. It is described in the petition as a highway, and the photographs in the record show it to be a plain, well constructed road across several railroad tracks. In the evidence it seemed to be assumed without objection that it was a public crossing over a number of tracks running east and west. From the south it crosses a railroad track of the Atchison, Topeka & Santa Fe Railroad. One hundred and twenty-three feet further north it crosses the Terminal Company's switch track. This switch track, immediately to the right of the crossing towards the east, branches off into what is described as a "maze of tracks" extending east for a long distance. Twenty-two feet north of the center line of the switch track was the center line of the eastbound main track used by the Railroad Company, and fifteen feet further north was the center line of the westbound main track on which the collision occurred.

Photographs introduced in evidence show the surrounding buildings and other objects as they appeared to the plaintiff in his approach from the south to these crossings. He was driving a truck, and his father, W. C. Dutton, was sitting at his right in the same seat. The plaintiff drove across the switch track, across the eastbound main track, and on to and across the westbound main track where the extreme rear part of his truck was struck by a westbound train. Both the plaintiff and his father were severely injured. The plaintiff was rendered unconscious for several days. He was unable to recollect any incident in relation to the collision, or anything that occurred after he reached a point several hundred feet before he got to the tracks. The plaintiff's father testified and had a definite recollection of all that occurred up to the time that he was knocked insensible. As they drove northward on the Penrod crossing, the tracks to the west, at their left, were obscured by a number of obstructions, which it is unnecessary to describe, and their purpose was to discover first if a train was approaching from the west, because

the eastbound main track was the one which they must cross first after the switch track. As they reached the switch track the truck stopped and the elder Dutton looked east and could see along the westbound track, upon which the collision afterwards occurred, for a distance of six or seven hundred feet. He said his son also looked. There was considerable movement in that section of the yards at that time. Eight or ten tracks which branched off from the switch track to the right, were south of the main tracks, and one or more engines were switching around on those tracks. Dutton did not complain that they obstructed his view. He saw no train approaching from the east. The truck then started up and he continued to look to the east until he got well up on the switch track. Then his truck was approaching the eastbound track upon which he might have trouble with a train coming from the west. Therefore his attention and that of his son were directed towards the west. They did not look any further towards the east until the truck got upon the eastbound main track, where they could see there was no danger from the west. By that time the front of the truck was almost upon the rail of the westbound track upon which the train was approaching, and he suddenly discovered a train bearing down upon them from the east, about a hundred feet distant. He called to his son who accelerated his speed and got the truck across the westbound track when the engine struck the rear end of it. The evidence of the elder Dutton upon that point is as follows: .

"Q. Now then, as you approached this switch track, did you give any attention to learn whether there was any sound of an approaching train of any kind? A. Yes sir.

"Q. What did you do? A. Stopped to look and listen to see if we could see anything from the east.

"Q. And where was it, with reference to this switch track, that you came to a stop there? A. *Just as we came up to it.*

"Q. Did you hear any whistle or other warning signal of an approaching train? A. We heard nothing of any whistle or anything of that kind.

"Q. What do you mean by that, a warning signal? A. Yes.

"Q. Who was it who was driving the truck and brought the truck to a stop at that point? A. The boy.

"Q. You are referring to your son, the plaintiff? A. Yes sir.

"Q. After you heard no signal of any approaching train, then what did you do? A. We started ahead across the tracks.

"Q. I will show the jury first Exhibit H which the photographer says is a photograph taken from the center of the roadway over the north rail of the switch track looking east. Now when you came on over the switch track when you left the point where you stopped to listen, and continued north, how long did you continue to look, if

at all, to the east? A. Until we got well up on the switch tracks so we could see around the cars.

"Q. How far down to the east could you see when you last looked at that time to the east? A. I would estimate about 600 or 700 feet.

"Q. Now then, when you last looked down to the east, when you were up there on the switch track, did you see anything of an approaching train coming from the east? A. No sir."

He then stated that they looked west to see if a train were coming from that direction upon the eastbound track; that they were driving approximately three miles an hour, "maybe not that fast;" that the seat of his truck was eight feet from the front end and the truck had a total length of nineteen feet.

One W. Atwell testified for the plaintiff. He had been an employee of the Terminal Railway Company; at the time of the occurrence he was working in the switch yard east of the point of collision; he saw the train coming and estimated its speed at *at least* twenty-five miles an hour. It passed him about a hundred feet east of the Penrod crossing. When he saw the train about a hundred feet from the crossing the truck was about two-thirds of the way across the track. The time at which it occurred was about 8:14 A. M. The track was dry. He testified further that a passenger coach extends over the rail on each side 2 feet and 6 inches; that a freight engine extends over the rails about the same as a passenger coach, and that applied to Engine No. 9, which was drawing the train that morning.

The engineer who drove the train was made a witness for the plaintiff. He testified that he first saw the truck right in front of the engine. He struck it. It was so close that he would have to split a second from the time he saw it. He ran the train approximately 400 or 500 feet before it was stopped after the collision. When he was about a hundred feet from the crossing, and the front of the engine 60 or 75 feet from the crossing, the fireman called, "Blow the whistle." He gave two blasts of the whistle, the second one just as he struck, then he put on the brakes. He testified that he would come within sight of the crossing between 600 and 1,000 feet from it, but that the right rail at the crossing would go out of his view, where he sat, when he got within 200 feet of the crossing. He sounded no whistle or warning of his approach until the fireman called to him to blow the whistle.

The plaintiff also pleaded and introduced in evidence an ordinance of Kansas City which limited the speed of trains to six miles an hour.

I. The trial court sustained a demurrer to the evidence solely on the ground that the plaintiff, as a matter of law, was guilty of

contributory negligence which precluded his recovery.   In the argu-
ment it is not claimed that the plaintiff was negligent

**Demurrer to
Evidence.**

after he started the truck across the eastbound track.
At that time, after he had withdrawn his attention
from the west to see if a train were approaching from that direction,
the front of his truck was already in danger from a train on the west-
bound track, and whether his judgment was at fault in attempting
to get on across, it is not claimed that he was negligent, as a matter
of law, in the attempt.   The respondent, referring to what Dutton
said about stopping to look and listen, thus presents the point relied
upon:

"The conclusion is irresistible that either the plaintiff and his
father did not look or listen for the approaching train, or that they
did look and saw the approaching train and attempted to beat the
train over the crossing, and in either of such events we submit that
recovery must be denied and that the learned trial court properly
gave the peremptory instructions requested."

In support of that position respondent cites a number of cross-
ing cases announcing the principle that one approaching a railroad
track must look and listen for an approaching train, and when to
look is to see the presumption is that the party either saw or failed
to look.   In all such cases the evidence showed that the person in-
jured either did not look or the evidence was conclusive that the
train or car which caused the injury was in plain sight.   The re-
spondent assumes that to be the case here, and figures that, with
the speed of the train shown by the evidence, and the speed of the
truck at three miles an hour, which Dutton swore to, when the plain-
tiff stopped his truck as he drove up to the switch track he would
have seen the train if he had looked, because it was within the range
of vision at that time.   We sometimes discredit positive testimony of
a witness when it is in direct conflict with known physical facts.   The
only physical facts which could make nugatory this statement of the
elder Dutton would be that the train which afterwards struck the
truck was in plain view when the truck stopped at the switch track.
Respondents figure that the distance from the center of the switch
track to the center of the track on which the collision occurred was
35 feet; that the plaintiff was going three miles an hour or 4 2/5
feet per second; the train was running at 25 miles an hour, or 36 2/3
feet per second, and figuring 8 seconds in which the truck would
travel 35 feet, the train would in the same time travel less than
300 feet, and therefore it must have been within the range of vision
when Dutton said he looked east.   The assumption is that the dis-
tances and the rates of speed of the truck and of the train, as given
by the witnesses, were absolutely correct.   It was 35 feet from the
center of the switch track to the center of the westbound track where

the collision occurred. The truck stopped when the wheels reached the rail of the switch track, and there the observation was made. Dutton, however, continued to look until they were on the switch track, 35 feet from the center of the westbound track. But the truck was not struck until it had passed clear over the westbound track, so that the rear only was hit one foot from the end. The plaintiff's seat was 8 feet from the front end of the truck which was 19 feet long, and he therefore sat 11 feet from the rear, and he was 10 feet beyond the point of contact. The overhang of the engine was 2½ feet, and the rail was 2 feet 4 inches from the center of the track; the point of contact was in the neighborhood of 5 feet beyond the center of the track, and the plaintiff was 15 feet beyond the center of the track. The plaintiff must have traveled, not merely from the time he stopped before driving on the switch track, but from the center of the switch track, when he last looked to the east, 49 or 50 feet. The elder Dutton said he was going three miles an hour, and that *it may have been less*. Instead of going 4 2/5 feet per second, he may have been going less than 4 feet per second. After stopping at the switch track it took some appreciable time to start and get in motion again, so instead of reaching the point of collision in 8 seconds, as defendant argues, it might have been 12 or more seconds from the time he last looked to the east, and longer than that from the time he stopped and made a thorough survey to the east. In that time the train, which was going *not less* than 25 miles an hour, and may have been going considerably faster, might well have been further than the point at which it could be seen. These, of course, are probabilities. The evidence is not definite as to the speed of either the truck or the train, nor the distance at which the train could be seen. The elder Dutton said he looked carefully to the east and saw no train coming, and he could have seen it if he had been within the range of vision. We have no right to say, as a matter of law, that his testimony was false and that the jury had no right to consider it. The most that can be said is that probably the train was in sight when the elder Dutton looked for it and failed to see it. It was for the jury to say whether his positive testimony is true; whether the testimony as to distance and probable rate of speed, contradicted his statement. The jury might have believed his statement that he looked carefully at the time the truck stopped, and until he got onto the switch track, and that the train was not in sight at that time. His attention after that was directed to the west until he got within the danger zone. Whether he was negligent in assuming that the train would not run at a rate of speed so great and dangerous as to collide with him while he traveled that distance was a question for the jury. [Monroe v. Chicago & Alton, 280 Mo. l. c. 491; Allen v. C. B. & Q. Ry. Co., 281 S. W. 737; Ward v. Mo. Pac. Ry. Co., 277 S. W.

908; Zumwaldt v. C. & A. Railroad Co., 266 S. W. 717.]   The case last cited is very similar in facts and in principle to this case.

The respondent ridicules the statement of the appellant that he could not remember anything that occurred while approaching the crossing, and knew nothing of the collision.   This is an argument that may be addressed to the jury.   It is a well authenticated scientific fact that anyone rendered insensible by a blow does not remember what struck him and sometimes his memory is obliterated for a few seconds before the blow was struck.   In this instance, from the distance which the plaintiff traveled, his amnesia must have covered a period of half a minute or more, yet a physician testified for the plaintiff that the effect of an injury such as the plaintiff suffered might knock out his memory for that length of time.

II.   The plaintiff pleaded facts which would bring the case within the humanitarian rule.   We find in the record no claim that the Penrod crossing was not a public way.   It is so alleged in the petition and spoken of as a public crossing by the witnesses.   We think the evidence sufficiently shows that it was a crossing used by the public, by anybody who had occasion to use it, although it may have been established in the first place for the convenience of the Penrod Walnut Corporation.   In that case the defendant had no right to rely upon the presumption that the track was clear.   The public had a right to use it.

The defendant's engineer testified that he came within view of the place where the truck was said to be when six hundred or more feet from the point of contact, and as he approached the crossing it was obscured from his view when he got within 200 feet of it on account of his position on the right-hand side of the engine.   But the fireman was on the other side of the engine all the time and within plain view of the crossing for six or seven hundred feet before the collision.   If he had been looking he would have seen the truck approach the crossing, with the apparent purpose of going across the tracks.   Ordinary care required that some sort of warning should have been given.

From the time the front part of the truck came within the danger zone at a point where it would have been struck by the on-coming train, until it was struck, it traveled the full length of the truck and the width of the engine less one foot—a distance of nearly thirty feet.   If the truck was going at one-eighth the speed at which the train was going, as the evidence seems to indicate, danger to the truck was perfectly apparent to the fireman of the train for at least 240 feet, and almost that even if the truck made a sudden spurt of speed when the plaintiff saw the train.   From the fact that the rear one foot of the truck was struck it is certain that only a quarter of a

second, or even less time, if the truck was speeded up at the last, was required for the truck to pass out of danger. Even the slightest decrease of speed by the train would have prevented the injury. The engineer testified that he had an emergency appliance for a quick stop, which he didn't use; that he did not attempt to stop until after the collision. Even in two hundred feet, five or six seconds before the collision, it is possible that he could have decreased the speed of the train. In fact he did stop it by using the ordinary method in 400 or 500 feet. It certainly was a question for the jury whether the engineer, after the fireman could have seen the plaintiff in the place of danger, could have slackened the speed of the train. The blast of the whistle which the engineer gave was useless, because the plaintiff had already seen the train, and the same effort used in decreasing the speed probably would have prevented the injury.

The judgment is reversed and the cause remanded. All concur. *Blair, J.*, in paragraph 2 and the result.