JOSEPH YAKUBINIS, a Minor, by JOSEPH M. FLYNN, His Next Friend, Appellant, v. MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, a Corporation.—100 S. W. (2d) 461.

Division One, December 14, 1936.

*Mason & Flynn* for appellant.

*Carl S. Hoffman* and *Everett Paul Griffin* for respondent.

COLLET, J.—This action arises out of an injury received by Joseph Yakubinis when he was struck by a train operated by the Missouri, Kansas & Texas Railroad Company on February 27, 1932, near the town of Portland, Callaway County, Missouri. Yakubinis being a minor at the time the suit was filed, the action was prosecuted in the name of Joseph M. Flynn, his next friend. The petition was filed and the case was tried in the Circuit Court of the City of St. Louis. The trial resulted in a verdict for the defendant. The plaintiff, appellant here, questions the propriety of certain instructions given on behalf of defendant. The defendant asserts that its demurrer to the evidence should have been sustained. If the demurrer should have been sustained error in defendant's instructions become immaterial. We will therefore first consider the propriety of the court's action in overruling the demurrer. In doing so, we consider only the evidence most favorable to the plaintiff. Those facts are as follows:

Some time during the month of January, 1932, the Woods Brothers' Construction Company (referred to as the construction company) began work on a contract it had with the Federal Government for the straightening, narrowing and deepening of the channel of the Missouri River at a point approximately two miles east of Portland, Missouri. At this point the Missouri, Kansas & Texas Railroad Company's tracks are located on the north side of the river between the bluff and the Missouri River. The construction company leased certain grounds between the railroad right of way and the river for use in the establishment of what is designated as a pile yard. Arrangements were made with the railroad company to construct a switch track on this leased ground in order that piling for use in the river work could be transported over the main line of defendant railroad company's tracks, thence onto the switch and there unloaded for use by the construction company. Immediately east of the pile yard a creek, known as Little Tavern Creek, empties into the river. East of the creek an independent contractor established a quarry late in the month of January or in the early part of February, 1932, from which rock was taken for use by the construction company in its work on the river. The construction company located at least three large boats a short distance west, or upstream, from the pile yard for the use of its employees engaged in the work. These boats were anchored to the north bank of the river which, at that point, was from 75 to 100 feet from the south or river rail of defendant's tracks. These boats were described by plaintiff's witnesses as having a total combined length of some 350 or 400 feet. They were sta-

tioned end to end and were held away from the bank by round piling extending horizontally from the boats to the bank. At the upstream or west end of the downstream boat a gang plank was placed and maintained for the use of the men in going from the boats to the river bank. From the end of the gang plank two paths led to the railroad track. One path went approximately due north from the end of the gang plank up the embankment to the track. There was no fence between the river and the tracks. Across the track from this path a stile had been erected over the right of way fence separating the railroad right of way from a pasture. The other path extended in a northwesterly direction from the end of the gang plank to the railroad track, intersecting the track at a point approximately due north of the west boat. East of the stile there was a gate through the same fence into the same pasture. This gate was approximately due north of the point of the switch which led to the pile yard. This pile yard was south and east of the point of the switch. East of the rock quarry the bluff extended south to within a short distance of the river. From the east bluff point going west, the track curved slightly to the south, thence across the bridge over Little Tavern Creek. From the west end of the bridge for a distance of approximately 170 feet the track was straight. It then curved slightly to the north, then to the south, passing the spur track switch on a curve. From the point of the switch west the track was comparatively straight until it reached a point described as the west bluff point, where it again curved to the north and around the point. The material distances from a viewpoint most favorable to plaintiff's case were as follows: From the west end of the bridge over Little Tavern Creek west to the point of the spur track was approximately 1200 feet. From the switch west for a distance of approximately 285 feet the track curves to the south. The extent of the curvature is fixed at from $\frac{1}{2}$ to $1\frac{1}{2}$ inches in each 100 feet. From the west end of this curve the track is straight for approximately 286 feet. It then proceeds west on a slight curve to the north until it finally passes around the bluff point. From the beginning of this latter curve it is approximately 100 feet to the beginning of the bluff. From the beginning of the bluff to the bluff point is approximately 150 feet. The extent of curvature of this latter curve does not exceed $1\frac{1}{2}$ inches to the 100 feet. A person standing on the track at the switch point looking west could see a distance of approximately 900 feet or to a point approximately 100 feet west of the bluff point. While the train was passing over that part of the track which curved to the south the engineer stationed on the north side of the engine cab could not see the track ahead because of the curve. During that time the fireman, stationed on the south side of the cab had an unobstructed view of the track. When

the track curved to the north this situation was reversed. The fireman stated that it was his duty to keep a lookout when the engineer could not.

On the day of the accident, February 27, 1932, the weather was clear and warm. Plaintiff and a companion were seeking employment. They arrived at that locality about nine-thirty A. M. and after making several inquiries at the pile yard and rock quarry as to the probabilities of obtaining employment, walked up the track toward the boats for the purpose of applying there. Reaching a point opposite the boats at the noon hour when those about the boats were engaged with the noonday meal and deeming that an inauspicious time to apply for work they seated themselves on the track at a point approximately north of the west end of the west boat which, according to other evidence offered by plaintiff placed them at or near the point where the path which ran northwesterly from the gang plank, intersected the track near the bluff point. The plaintiff was seated on the rail, his companion was sitting at his left (east) on the end of a tie. Both were facing the boats and the river. The defendant's westbound passenger train approached from the east, reducing its speed as it rounded the point of the east bluff to approximately forty-five miles per hour. Plaintiff's evidence is to the effect that no whistle was sounded until the engine was from thirty to forty feet from where plaintiff and his companion were sitting. At that time plaintiff states he heard a rumble and a whistle at the same time, and, glancing to his left saw the engine, undertook to leap to safety, but was struck and seriously injured. His companion was killed. A number of men were employed by the Woods Brothers' Construction Company who lived on the boats. In addition, a number of residents of the community were employed by the construction company who came to and from their work along the track from Portland east to the boats and the pile yard. The total number of men working at the pile yard who lived in that vicinity and those who lived on the boats was fixed at approximately seventy-five or eighty, about one-half of which number lived on the boats. Different witnesses fixed the number of these men who were employed at the pile yard at from forty to sixty-five. In addition to these men the rock quarry employed approximately 125 more. The pasture referred to above extended from a point a short distance east of the pile yard almost to the west bluff point. In this pasture and at a point almost due north of the pile yard, a refreshment stand had been placed by some individual whose name is not disclosed, at which liquor, principally, and some other commodities appear to have been sold. A number of the men working in the pile yard crossed the tracks at the switch, then went through the gate into the pasture, some patronizing the liquor stand, others for the purpose of eating their

lunch and playing ball. The path leading directly north from the gang plank across the track and over the stile into the pasture was frequently used by workmen passing to and from the boats and the pasture. The path leading from the gang plank northwesterly to the track was described as a well-beaten path used in going to and from the track to the boats. A fair inference from the testimony of some of plaintiff's witnesses is that this path was used by men who lived on the boats in going to and from Portland. The track from Portland to points east of the boats was used by sight-seers and persons not employed by the construction company or at the quarry, one of plaintiff's witnesses fixing the average number of such persons using the track at from twelve to fifteen daily. Practically all of the men working at the pile yard brought their lunches which they left in the pasture and ate there at noon.

██ The plaintiff pleaded long and continuous user of the track, thereby charging defendant with the responsibility of keeping a lookout which it is alleged the defendant negligently failed to do. Unless defendant's responsibility for keeping a lookout for pedestrians at the place of the injury is established, there can be no negligence predicated upon its failure so to do. The rule is stated in Hufft v. Railroad, 222 Mo. 286, 1. c. 301, 121 S. W. 120, as follows:

"(a) In the first place, if the person injured is at a place whereat the defendant is entitled to expect a clear track, and for that reason is not required to be on the lookout for persons on the track, then before there can be liability the plaintiff must show that the injured person was seen in a position of peril by defendant's servants in time for them to have prevented the injury by the exercise of reasonable care and caution, after such perilous position was seen and known.

"(b) But if the person injured was at a place where defendant had no right to expect a clear track, and therefore there was upon its servants the incumbent duty to be on the lookout for persons upon the track, then if the injured person might have been seen in a perilous position in time to have prevented the injury, by the exercise of ordinary care and caution upon the part of defendant, its agents and employees, then the defendant is liable whether such employees actually saw him or not. And this, because it was their duty to have been on the lookout for him and to have seen him."

On the question of what constitutes a user sufficient to create that responsibility, this court in Eppstein v. Mo. Pac. Ry. Co., 197 Mo. 720, 1. c. 734, 94 S. W. 967, said:

"Then, too, there might be a case lying between said extremes, and in our opinion this is one, where the use by the public of the track was of such sort that it became a mixed question of law and fact whether those running a locomotive engine had reason to anticipate the presence of people, and in such case that issue should be sub-

mitted to the jury, as a fact to be determined by it. Liability in each instance is predicated of knowledge or notice of the user. Such notice may be proved by the existence of paths well worn by human feet, and by gaps, stiles and gates appurtenant to such path, by the long-continued going to and fro of people more or less constantly, and by the proved presence of schools, places of recreation, etc., and the use of the track by visiting pedestrians and habitues, all of which elements are presented in this case to an extent of such significance as made the issue, in our opinion, one for the triers of fact to decide.''

In addition to the facts set out above the defendant's trainmaster in charge of the maintenance of defendant's track at this point was riding in the engine cab with the engineer and fireman on the day of the accident and testified that he knew of the presence of the men working in the immediate vicinity of the accident, had supervised the construction of the switch into the pile yard and knew of the operations at the rock quarry. In view of the facts related the demurrer was properly overruled.

Defendant contends that the user was shown to have existed on the part of the employees of the Woods Brothers' Construction Company only, with the result that the obligation to keep a lookout extended to those employees only and did not exist as to the public generally. Since there was substantial evidence to the effect that the use of the track at the point of the accident was not confined to employees of the construction company but included sight-seers, employees of the rock quarry and persons seeking employment with the construction company, that question is not presented by this record.

Appellant complains of the giving of respondent's Instruction 8 which is as follows:

''The fact that the track of the defendant at the place where plaintiff was injured was occasionally used by pedestrians for their convenience does not constitute a user as described in these instructions.''

The argument is made that the instruction was equivocal and ambiguous in that an ''occasional use'' might be so frequent, continuous, habitual and long continued as to constitute such a user as would create the duty to keep a lookout, or, that it might be so infrequent that no such obligation resulted. Since the instructions given on behalf of appellant clearly told the jury that the use of the track necessary to place the responsibility upon respondent to keep a lookout was ''so continuous and extensive that the defendant knew of the same and had reason to expect the presence of persons on its track'' and respondent's Instruction 9 informed the jury that the track must have been ''habitually'' used to create the obligation, the jury could not have improperly interpreted the instruction.

Respondent's Instruction 9 is as follows:

"The court instructs the jury that (although they may find from the evidence that persons were in the habit of walking on the railroad track from time to time where plaintiff was injured, and that the defendant knew it, yet, unless they further find that its track at this place was habitually so used and that defendant knew it), or by the exercise of ordinary care might have known it, then the defendant's servants in charge of the train owed no duty to keep a lookout at that place for persons on the track and it was not liable in that case for injuries received by the plaintiff unless its servants in charge of the engine and train which injured him saw or knew that he was in a dangerous position, or by the exercise of ordinary care could have known his dangerous position on the track in time to have stopped the train and avoided injuring him and failed to do so." (Parenthesis ours.)

It is criticized upon two grounds. First, that the portion within parenthesis gives conflicting and ambiguous directions. It is argued that if persons were in the habit of walking on the railroad track then *ipso facto* the track was habitually so used. The argument presupposes that the words "habit" and "habitually" in the manner used here, have exactly the same or equivalent meanings. While it is possible that a juror may have possessed and exercised the same degree of analytical power and literary exactness as counsel displays in construing this instruction and thereby arrived at the same conclusion as to its meaning, yet the usual and ordinary meaning conveyed by a statement that a railroad track was used by "persons in the habit of walking on it from time to time" and a statement that a railroad track was "habitually used by persons walking upon it" are distinctly different, the latter statement conveying an impression of greater continuity and frequency. The bare possibility of an improper construction of the language used prompts a condemnation of its phraseology yet the extreme improbability of such a result forbids a holding that its use constituted reversible error.

The second objection made to the instruction is that it directed a verdict for the defendant unless the jury found that defendant knew, or could, by the exercise of ordinary care, have known of plaintiff's position of peril in time to have *stopped* the train and avoided injuring him and failed to do so, when defendant's failure to stop the train was not submitted to the jury as a ground of recovery.

The petition alleged three assignments of negligence—failure to warn, failure to slacken the speed and failure to stop. There was no proof that the operators of the train saw plaintiff. Neither was there any proof whatever that the train could have been stopped after plaintiff could have been seen. On the contrary the evidence was rather conclusive that it could not have been stopped. As above

related, the evidence from a viewpoint most favorable to plaintiff was that a warning was not given nor the speed slackened after plaintiff could have been seen had a lookout been maintained. Plaintiff abandoned the assignment of negligence relating to the stopping of the train and submitted his case upon the failure to warn or slacken the speed, yet this instruction flatly tells the jury to find for defendant if it found that the train could not have been stopped. The instruction was clearly erroneous, and, since the evidence was uncontroverted that the train could not have been stopped, amounted in effect to a peremptory instruction to find for defendant. It is argued by respondent that the words ''and avoided injuring him'' appearing in the last line of the instruction constitutes a direction to the jury to find for defendant only in the event the enginemen could have avoided injuring plaintiff by any means. It is not reasonably susceptible to that construction but clearly means that the jury should find for defendant unless the train could have been stopped *thereby* avoiding the accident.

It is further urged by appellant that respondent's Instruction 12 which informed the jury that the plaintiff while sitting or lying upon the railroad track was a trespasser, was erroneous for the reason that (1) it failed to inform the jury what deduction, if any, the jury should make from the fact that plaintiff was a trespasser, (2) because it interjected the defense of contributory negligence into a humanitarian doctrine case, and (3) because it assumed that plaintiff was lying on the track, thus emphasizing his negligence. There is no merit in any of these contentions. Plaintiff's instructions informed the jury that, finding certain facts to be true, it should give no effect to the fact that plaintiff was a trespasser or was negligent. There is no indication that appellant was in any manner prejudiced by the instruction even if it assumed he was lying on the track.

Because of the error in the giving of respondent's Instruction 9 the cause is reversed and remanded. All concur.