J. W. FLINT v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, Appellant.—No. 40282.—207 S. W. (2d) 474.

Division One, December 8, 1947.

Rehearing Denied, January 12, 1948.

*J. A. Lydick* and *Hunter, Chamier & Chamier* for appellant.

218

*C. M. Hulen* for respondent.

[475] HYDE, J.—This is an action for damages for the death of plaintiff's 13 year old son. Verdict and judgment were for plaintiff for $8000.00 and defendant has appealed.

Plaintiff's son, Charles W. Flint, was killed on August 14, 1945 when a truck in which he was riding was struck by defendant's passenger train at a crossing a mile and a half east of Clark in Randolph County. The case was submitted on primary negligence of failure to give timely and adequate warning and on humanitarian negligence of failure to stop or slacken speed. Defendant contends that plaintiff's evidence was insufficient to make a case for the jury on either theory, and that it was entitled to a directed verdict. Defendant also alleges error in giving the two instructions, separately submitting each of these charges of negligence, contending that neither was supported by the evidence.

Charles lived in Bartlesville, Oklahoma and was in the eighth grade in Junior High School there. He was a bright, intelligent boy with an unusual I. Q., a good mind, and quick to understand. He was 13 years old and about 4 feet 6 inches tall. He had traveled in various parts of the United States with his parents and "had been around enough to take care of himself." He understood the danger of being on a railroad track. He was visiting his aunt, Mrs. Truesdell, in Clark in August 1945. He had visited there during the last four summers, at first with his parents, but had come from Kansas in a car

with an older cousin the previous summer. That summer he came on the train and had been there for about a week before the casualty. Mr. Truesdell and his brother had a feed and produce store in Clark. Charles frequently stayed at the store and became interested in threshing going on near Clark on land owned by the Truesdells, to which they were sending their truck driven by Donald Cable. Charles went there with Cable on this truck two days before, driving over the private crossing where the casualty occurred; and had been on many other trips in this truck. He had not yet learned to drive a car.

The threshing was being done north of the railroad which ran almost due northwest for more than half a mile on each side of the crossing. There was a lane through the field, used by persons who farmed the land north of the railroad. This lane crossed the railroad about 1000 feet north of the public gravel road. The railroad had a right-of-way of 100 feet and there was a corner post 50 feet south of the center of the track. The right-of-way was fenced to the northwest of this post but not to the southeast, and in this direction it was covered with high weeds. The lane made a short S curve around this corner post to the track, curving first to the left (west) and then back to the right to the incline which took it over the track. [476] The track was on an embankment about four feet above the fields which were level and flat. The day of the casualty was clear and the lane was dry. Plaintiff had a survey made which showed that the crossing was 4 1/2 feet higher than the lane at the corner post (although in testifying this surveyor said 3.7 feet); while between the corner post and the beginning of the incline to the crossing (which began about 25 feet from the crossing) the low point in the lane was about one foot lower than at the corner post. Plaintiff's surveyor made tests to see if a person standing at the low point of the lane could see down the track and said he could see about 200 feet. He estimated that standing in the road north of the corner post he could see an engine 600 or 700 feet. He also said he could see the crossarms on nine telegraph poles from this point. Defendant had evidence of a surveyor to show that, with a solid obstruction six feet high, ten feet from the lane, at least 3 feet, 6 inches of the engine (the smoke stack of which was 15 feet, 2 inches high) could have been seen 530 feet east of the crossing from the low point in the lane.

At the time of the casualty most of the weeds were five or six feet high, between the right-of-way line (at the corner post) and the railroad embankment, although some weeds were much higher than the rest. These weeds came within 8 or 10 feet (cut back two swaths) of the east side of the roadway. Plaintiff's pictures taken the next day with the camera at a height of 4 feet 6 inches show that these high weeds extended to the embankment with shorter weeds on the embankment. Some of plaintiff's evidence indicated that when sitting in the truck the boy's eyes would have been about five feet above the

ground. Defendant's evidence was that the bottom sill of the truck window was 57 inches above the ground. These pictures also show at least three telegraph poles (130 feet apart) on the north side of the embankment clearly visible through the higher weeds, showing the two crossarms on each, and the rails could be seen beyond the first one east of the crossing. The pictures show much foliage on these weeds and that they had grown up thickly so that one could not see through them at the 4 1/2 foot level. One of plaintiff's witnesses said the weeds were higher than his head, standing on the railroad track, but the pictures do not substantiate this except perhaps in the case of a few weeds much taller than the rest.

Plaintiff offered the testimony (depositions) of the engineer and fireman which showed that the train was running at a speed of between 33 and 39 miles per hour; that braking in emergency the train could have been stopped in about 500 feet; and that it was stopped about 600 feet beyond the crossing, the brakes being put on after the engine hit the truck. The rated (time-table) speed was 50 miles per hour but they had slowed approaching the signal at Clark where they often had to stop at the Wabash crossing. The fireman was on the south side of the engine and saw the truck approaching; the engineer on the other side could not see it. The fireman said when he first saw the truck "it was about where the road curves before it makes a curve to come up on the track." (Near the corner post.) He said that the engine was then about 200 or 250 yards east of the crossing and the truck about 15 or 20 yards south. He said: "When I saw the truck I turned to call the engineer's attention to a truck coming, just as he got hold of the whistle to blow it, and I didn't say nothing then, be impossible to make him hear—couldn't stop anyway." He said that just as he turned the engineer blew the whistle and kept it blowing (two longs and two shorts) until they reached the crossing. The engineer said he whistled because he saw men in the field north of the track and because he made a practice of whistling for private crossings.

The fireman said that the truck slackened speed 20 or 30 feet south of the crossing, "stopped or almost stopped", and then moved forward at accelerated speed, "just like you would put a truck or car in low gear and step on the gas." He said the truck hit the pilot beam of the engine, right back of the radiator of the truck, and was swung around against the side of the engine.

Cable, the driver of the truck, who was also plaintiff's witness, gave similar testimony as to its movements. He said that [477] when he reached the corner post he was not going over five miles an hour; that he almost stopped to change to a lower gear as the front end of the truck "was just ready to start up the incline for the crossing" about 20 or 25 feet from the south rail; and that he drove up the incline about 4 or 5 miles per hour. He said at that speed he "could

have stopped it right now . . . three or four feet.'' Cable said that he asked the boy ''if a train was coming'' when they reached the corner post. He thought he could see 200 or 300 feet east down the track at that time. He said the boy looked east and said he didn't see any train coming He looked too, and also looked west. He said that the weeds were right up to the edge of the ballast. He stated his conclusion that the boy could not have seen a train approaching from the east after the truck passed the corner post. He said that the view would be worse going north from the corner post because the ground was lower between there and the beginning of the incline. He said the engine struck the truck just as the front wheels got over the south rail.

Plaintiff had one eyewitness, who testified positively that the engine did not whistle at this crossing. (The others only said they did not hear it.) He was Charles Ward who was plowing in a field 200 or 300 yards southwest of the crossing. He saw the train coming and saw the steam from the whistle before it reached the public road crossing a half mile southeast. He also saw the truck coming up the lane and stood up on his tractor to watch both until they collided at the crossing. He said the train never whistled after it crossed the public road crossing. He also said that the truck ''went slow into this curve'' and after getting beyond it ''he was going slow but didn't stop.'' He said: ''Just before he entered the approach over the track he shifted the gear.'' When he shifted gears he said he was ''right at the bottom of the incline'', about 20 or 25 feet from the track. He said he then went up the incline and ''the cow catcher hit under the front wheels'' of the truck. He said the train ran ''a good quarter of a mile'' before it stopped. Ward also said that ''the weeds were extremely high and so thick you couldn't walk through them on the (east) side of the road''; but that ''they were cut back a short piece in the right-of-way.'' He also said that he thought it was impossible for the occupants of the truck to see the train from the lane north of the corner post.

Considering the evidence most favorably to plaintiff's contentions, we think it is clear that plaintiff failed to make a humanitarian negligence case on failure to stop or slacken speed. The duty of the defendant to act commenced only when it became reasonably apparent to its fireman (who saw the approaching truck while keeping a lookout on that side of the engine) that the truck driver was oblivious to the approaching train and would not stop before reaching the track. [Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S. W. (2d) 368; Perkins v. Terminal R. Assn., 340 Mo. 868, 102 S. W. (2d) 915; Hendrick v. Kurn, 352 Mo. 848, 179 S. W. (2d) 717; Knorp v. Thompson, 352 Mo. 44, 175 S. W. (2d) 889.] All witnesses agree that the truck gave every appearance of stopping and came almost to a stop at the foot of the incline which was not more

than 25 feet from the track. There were no reasonable appearances of the truck and its occupants being in a position of imminent peril until it accelerated speed and started up the incline after so slowing almost to a stop. The truck, at 4 miles per hour, would have traveled 25 feet in approximately 4 1/6 seconds. The train, at 39 miles per hour, in 4 1/6 seconds, would have traveled approximately 244 feet. Therefore, on these speeds the train was not more than 244 feet east of the crossing when the truck started up the incline. The only evidence as to stopping the train was that the engineer said 500 feet would be a good stop at 40 miles per hour, and this made no allowance for reaction time. [See Stark v. Berger, 344 Mo. 170, 125 S. W. (2d) 870; Krause v. Pitcairn, 350 Mo. 339, 167 S. W. (2d) 74; Shelton v. Thompson, 353 Mo. 964, 185 S. W. (2d) 777.] The speed of the train was estimated at from 33 or 34 to 38 or 39 miles per hour, and the speed of the truck at 4 or 5 miles per hour, and the distance from the foot of the incline to the track at 20 or 25 feet. Based on any of [478] these speeds and distances it is obvious that the train could not have been stopped in time to have avoided the collision after the truck entered the danger zone and the duty to act began.

Likewise on slackening speed, plaintiff's evidence was insufficient to remove the case beyond mere speculation and surmise. Although witness Ward estimated that the train was about 250 yards (750 feet) east of the crossing when Cable shifted gears 20 or 25 feet (also Ward's estimate, but which was corroborated by all witnesses) south of the crossing, it is nevertheless certain that the truck and train arrived at the crossing at the same time. Thus from plaintiff's evidence as to speeds, the train could not have been 750 feet east of the crossing when the truck started up the incline. To travel this distance in less than five seconds would require more than 100 mile per hour speed. The only evidence as to slackening was the testimony of the engineer that he could come almost to a stop in 200 yards traveling from 34 to 39 miles per hour. This was corroborated by his testimony and that of the fireman that the train was actually stopped in that distance after the casualty. There is no evidence as to what extent the train could have been slowed down, in the distance (244 feet) it must have been from the crossing, at a speed of 39 miles per hour. (Or if the speed was 33 miles per hour in about 207 feet.) Considering reaction time, and the distance it would have traveled (at between 50 and 60 feet per second) before the brakes began to take effect, there is no showing that the collision could have been avoided by any slackening possible after the imminent peril arose. This is not a case of almost escaping so that a slight slackening would have allowed the truck to clear the track. [See Gann v. C., R. I. and P. R. Co., 319 Mo. 214, 6 S. W. (2d) 39; State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S. W. (2d) 864;

Perkins v. Terminal R. Co., supra; Smith v. Thompson, 346 Mo. 502, 142 S. W. (2d) 70.] Only the front wheels of the truck had crossed the nearest rail. The overall length of the truck was 21 feet, 8 inches. If slackening had delayed the arrival of the train at the crossing between two and three seconds it could not have cleared the overhang of the engine. [See Wolverton v. Kurn, 348 Mo. 908, 156 S. W. (2d) 638; Meese v. Thompson, 344 Mo. 777, 129 S. W. (2d) 847; Kick v. Franklin, 342 Mo. 715, 117 S. W. (2d) 284.] There is no evidence to show that the truck could have been stopped and backed away from the crossing in any less time than required to go on across. In this situation, we hold that plaintiff failed to make a case of humanitarian negligence on either ground submitted. It was, therefore, prejudicial error to give the instruction, offered by plaintiff, submitting these grounds of recovery.

■ Defendant contends that the court erred in submitting plaintiff's charge of primary negligence of failure to give a warning signal at this crossing because the evidence with respect to obstructions and user, and defendant's knowledge of the same, was not sufficient to place upon defendant such common law duty; and also because plaintiff's son was guilty of contributory negligence as a matter of law in failing to discover the approach of the train or that the negligence of the driver should be imputed to him by reason of his participation in the operation and control of the truck. We cannot agree with these contentions.

The evidence as to user was (M. E. Cross) that the crossing had been used for more than 60 years, and that there used to be a station near it; (Claude Shores) that he had known the crossing about 45 years; that "everybody uses it"; that he used it every week to go to his land north of the tracks; that it was also used to go to the Truesdells' land and by the people living on Dr. Miller's place; and that there were four different people who had crops there that year using it. It also seems to be a reasonable inference that this lane connected with an east and west gravel road about 3/4 mile north of the crossing. There was no gate (or fence along the road) at the entrance of the lane from the gravel road on the south, and there were no gates at the crossing. The crossing was maintained with planks placed between the rails. Defendant's engineer had been on this run a long time and knew the location of this crossing and others [479] both public and private, and said that he made a practice of whistling for all of them day or night; but the engineer and fireman both said they had never before seen anyone on this crossing. Thus it appears that this was not an ordinary private entrance to a single farm, as in Vorhees v. Chicago, R. I. & P. R. Co., 325 Mo. 835, 30 S. W. (2d) 22, and English v. Wabash Ry. Co., 341 Mo. 550, 108 S. W. (2d) 51. It was the way to reach several farms; it was open to the use of anyone, unfenced and without gates; and had been so

used for more than 60 years. We think this evidence was sufficient to make a jury issue on public use of this crossing sufficient to impose a common law duty to warn under the circumstances of this case. [See Salisbury v. Quincy, O. and K. C. R. Co. (Mo. App.), 268 S. W. 896; Dutton v. Terminal Ry. Assn., 316 Mo. 979, 292 S. W. 718; Savage v. Chicago, R. I. & P. R. Co., 328 Mo. 44, 40 S. W. (2d) 628; Yakubinis v. M.-K.-T. R. Co., 339 Mo. 1124, 100 S. W. (2d) 461, 345 Mo. 943, 137 S. W. (2d) 504; 44 Am. Jur. 748, Sec. 508, p. 760, Sec. 516.] While the testimony of the engineer and fireman shows full compliance with this duty, plaintiff had positive testimony to the contrary (Ward); so this was likewise an issue for the jury.

■ We likewise conclude that the issue of negligence of plaintiff's son was for the jury. In the absence of visible lack of caution on the part of the driver or known imminence of danger on his part, a guest may ordinarily rely upon a driver who has exclusive control of the vehicle. [Lynch v. M.-K.-T. R. Co., 333 Mo. 89, 61 S. W. (2d) 918; Thompson v. St. Louis-S. F. R. Co., 334 Mo. 958, 69 S. W. (2d) 936; Borrson v. M.-K.-T. R. Co., 351 Mo. 229, 172 S. W. (2d) 835.] We think this is particularly true of a 13 year old boy, who was only a visitor in the community, riding with a man who was employed to operate the truck and who was making the trip for a special purpose connected with his work. It is true that a 13 year old boy may be guilty of contributory negligence as a matter of law in going on a railroad track as held in McGee v. Wabash Ry. Co., 214 Mo. 530, 114 S. W. 33; Walker v. Wabash Ry. Co., 193 Mo. 453, 92 S. W. 83; Payne v. Chicago & Alton R. Co., 136 Mo. 562, 38 S. W. 308, cited by defendant. However, these were all cases where a boy went on the track when a train was in sight, of his own volition, knowing he must rely entirely on his own senses.

Nor is this a case like Landrum v. St. Louis, I. M. & S. R. Co. (Mo. App.), 178 S. W. 273, relied on by defendant, in which the plaintiff said to the driver (both men): "This is a dangerous place; we will have to look out" and then after looking told him "It was all right." They were crossing 6 or 7 tracks in railroad yards at night. There were no obstructions, the driver definitely relied on the plaintiff therein, who "was entirely familiar with the location," to keep a lookout with him all the way across, and the plaintiff "assumed to direct the driver." Here Cable asked the boy to look for a train only after he had reached the corner post and passed behind the weeds. The boy complied by looking and said he saw nothing, The driver, who knew and appreciated all the hazards of the situation, still had the duty to keep a careful lookout all the way to the track. There is nothing to show that he called on the boy to do anything more or said anything to keep him alerted. In Nahorski v. St. Louis Electric Terminal, 310 Mo. 227, 274 S. W. 1025, also relied on by defendant,

228

the jury found a guest guilty of contributory negligence and we held only that there was substantial evidence to support such a finding. We likewise think there is substantial evidence to support a finding of the boy's contributory negligence in this case. However, we do not think it can be conclusively held that he asserted control over the operation of the truck or assumed responsibility for thereafter directing the driver and was not entitled to rely on his greater knowledge of the situation. While the pictures indicate that it would not have been impossible for the boy to see some of the upper parts of the engine through or over the weeds, nevertheless, it is obvious that his view was partially obstructed. Perhaps the boy looked negligently when [480] he did look, but because of the obstruction we think that is for the jury to decide. We cannot come to the conclusion that reasonable minds could not differ on this issue.

Defendant further contends that there is nothing to show that defendant knew of the existence of obstructions at this crossing because it did not own, operate or maintain either the crossing or the tracks over which the train was operated. There is enough in the evidence to show that defendant operated its train over the line of the Chicago and Alton, using Chicago and Alton engine crews from Mexico west. The engineer and fireman did know this line and the Chicago and Alton section men maintained the tracks and the crossing. We think Section 5163, R. S. 1939, Mo. Stat. Ann. is broad enough to cover this kind of a situation so that under its terms defendant is liable, as lessee or licensee, "in the same manner, as if operating its own road."

Defendant alleges error in Instruction A, submitting primary negligence, in restricting issues, assuming facts, ignoring defenses and failing to require a finding that the facts hypothesized constituted negligence. In view of the result reached, it is not necessary to discuss these in detail. The instruction can be re-drafted to meet these criticisms if the case is re-tried. Defendant also complains of the court's ruling admitting in evidence the depositions of the engineer and fireman when they were present in court, apparently brought there by defendant. It is true that plaintiff did not make proof to show that they were within any of the provisions of Section 1944, R. S. 1939, Mo. Stat. Ann. authorizing the use of depositions. However, at the time these depositions were taken, the parties entered into a stipulation to the effect that, in addition to this case, Cable and Truesdell Brothers also had cases pending in the Circuit Court of Randolph County against defendant, and "that these depositions may be *read* and used as depositions taken in any one of the three above mentioned cases." (Our italics.) We think this was broad enough to authorize their use in this case.

Defendant further alleges error in the refusal of the trial court to admit in evidence photographs taken by it showing the lane,

the crossing, the railroad embankment and other physical features of the terrain near to the scene of the casualty at greater distances from the crossing and giving a more comprehensive view than shown in plaintiff's pictures. We think this contention must be sustained. Defendant's pictures were taken some time after the casualty, some in November 1945 and others in 1946 just before the trial. However, plaintiff's survey was made in 1946 covering the territory shown by defendant's pictures, and he examined his surveyor extensively as to conditions then existing and as to visibility tests made at that time. Defendant had evidence to show that the only difference in the situation between plaintiff's pictures in August 1945 and its pictures in November 1945 was the foliage on the weeds, the stalks were still standing. This was a difference which the jury could understand. In Hunt v. St. Louis, 278 Mo. 213, 211 S. W. 673, we held that if the photograph tells the truth about the situation and surroundings so far as it purports to show these things, it ought not to be excluded "simply because it does not show some of the surroundings, the showing of which has by the time the photograph is taken become impossible." [See also 20 Am. Jur. 611, Sec. 731; 32 C. J. S. 620, Sec. 715.] Defendant should be entitled to show in pictures what plaintiff showed on his surveyor's map.

The judgment is reversed and cause remanded. All concur.